678 F.2d 257
 28 Fair Empl.Prac.Cas. 1614,
25 Wage & Hour Cas. (BN 614,
28 Empl. Prac. Dec. P 32,668, 219 U.S.App.D.C. 393,
94 Lab.Cas. P 34,186
 Dorothy M. THOMPSON, et al., Appellants,
v.
Danford L. SAWYER, Jr., Public Printer, Individually and as
Public Printer of the United States, and his
agents, assigns and successors in office.
Dorothy M. THOMPSON, et al.,
v.
Danford L. SAWYER, Jr., Public Printer, Individually and as
Public Printer of the United States, and his
agents, assigns and successors in
office, Appellant.
Dorothy M. THOMPSON, et al.,
v.
Danford L. SAWYER, Jr., Public Printer, Individually and as
Public Printer of the United States, and his
agents, assigns and successors in
office, Appellant.
Dorothy M. THOMPSON, et al., Appellants,
v.
Danford L. SAWYER, Jr., Public Printer, Individually and as
Public Printer of the United States, and his
agents, assigns and successors in office.
 Nos. 80-2098, 80-2099, 80-2429 and 80-2495.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 23, 1981.
Decided April 27, 1982.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 74-01101).
 Robert C. Seldon, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, Royce C. Lamberth, Kenneth M. Raisler and David H. Shapiro, Asst. U. S. Attys., Washington, D. C., were on the brief, for Sawyer, et al., appellants in Nos. 80-2099 and 80-2429, and cross-appellees in Nos. 80-2098 and 80-2495.
 Nora A. Bailey and David M. Dorsen, Washington, D. C., with whom Roderic V. O. Boggs, Washington, D. C., was on the brief, for Thompson, et al., appellees in Nos. 80-2099 and 80-2429 and cross-appellants in Nos. 80-2098 and 80-2495.
 Before ROBB, MIKVA and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 Opinion dissenting in part filed by Circuit Judge ROBB.
 MIKVA, Circuit Judge:
 
 
 1
 This multi-faceted sex discrimination suit was brought by women bindery workers at the Government Printing Office (GPO). They sought relief under two statutes: the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1976), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1976). The district court granted the bindery workers part of what they sought under each statute, and both sides have appealed. GPO maintains, as to the aspects of the decree it challenges on appeal, that it did not violate either Title VII or the Equal Pay Act; the plaintiffs argue that GPO's conduct violated both statutes more extensively than the district court found. We affirm the judgment of the district court in all respects save as to certain features of the remedy provided under Title VII.
 
 I. THE APPLICABLE STATUTES
 
 2
 The Equal Pay Act prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex. 29 U.S.C. § 206(d) (1976). It was passed in 1963, as an amendment to the Fair Labor Standards Act (FLSA), Pub.L.No. 88-38, 77 Stat. 56. Under the Equal Pay Act, employees have access to the recovery provided by the FLSA, including unpaid wages and an additional equal amount as "liquidated damages," 29 U.S.C. § 216(b), (c) (Supp. III 1979). Recovery is limited normally to two years, but extended to three years for a willful violation, id. § 255 (1976). In 1974, the definition of "employer" in the FLSA was amended to include public agencies, id. § 203(d) (1976), thus allowing federal employees to sue under the Equal Pay Act.
 
 
 3
 Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice to discriminate with respect to "compensation, terms, conditions, or privileges of employment" on grounds of sex. 42 U.S.C. § 2000e-2(a)(1) (1976). Title VII also prohibits an employer from classifying employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of sex. Id. § 2000e-2(a)(2). If a court finds that an employer has violated Title VII intentionally, it may issue injunctive relief and "such affirmative action as may be appropriate," including back pay reaching to two years before the employee filed the complaint. Id. § 2000e-5(g). Affirmative relief may also include hiring requirements and "front pay"-back pay extended into the future to compensate for the continuing loss of employment opportunities until vacancies become available. See, e.g., B. Schlei & P. Grossman, Employment Discrimination Law 1241 (1976). Suits against the federal government under Title VII were first authorized in 1972, two years before the FLSA was similarly expanded to cover federal employees. 42 U.S.C. § 2000e-16 (1976).
 
 
 4
 Although allegations of large-scale sexual discrimination are likely to involve complaints under both the Equal Pay Act and Title VII, the interrelationships between the statutes have proved troublesome. The same employment situation may give rise to a claim for relief under either statute. Plaintiffs may recover under both statutes provided each is separately satisfied and the plaintiff does not recover doubly for the same wrong. E.g., Laffey v. Northwest Airlines, 567 F.2d 429, 445 (D.C.Cir.1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). For example, a plaintiff may recover under the Equal Pay Act for unequal pay for equal work, and obtain additional recovery under Title VII for discriminatory denial of training or promotion opportunities.
 
 
 5
 The initial major focus of Title VII was the prohibition of racial discrimination, H.R.Rep.No.914, 88th Cong., 1st Sess. 10 (1963). After Title VII had been amended from the floor to include the prohibition of sexual discrimination, 100 Cong. Rec. 2577 (1964), Congress did not immediately appreciate the potential interplay between the two statutes, although Title VII was considered and adopted by the same Congress only a year after passage of the Equal Pay Act. In order to reconcile the two statutes, Senator Bennett introduced an amendment specifying that differential compensation would not be an unfair employment practice under Title VII if it was "authorized" by the Equal Pay Act, 110 Cong. Rec. 13,310 (1964). This provision, the Bennett Amendment, 42 U.S.C. § 2000e-2(h) (1976), is the only statutory link between Title VII and the Equal Pay Act.
 
 
 6
 Whether the Bennett Amendment limits recovery for discriminatory compensation under Title VII to situations in which recovery under the Equal Pay Act will also lie, has been a subject of extensive debate.[1] The Supreme Court recently held that the Bennett Amendment incorporates the defenses enumerated in the Equal Pay Act into suits under Title VII for discriminatory compensation, but does not limit such Title VII suits to situations in which the employees would qualify for recovery under the Equal Pay Act. County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Thus the Court has clarified that the statutes erect separate analytic frameworks that stand on their own but must be interpreted consistently. Id. 101 S.Ct. at 2247. Our analysis, therefore, builds on the recognition that the Equal Pay Act and Title VII differ in scope and provide different remedies for employment discrimination based on sex.
 
 II. THE CONTEXT AND THE LAWSUIT
 A. The Government Printing Office
 
 7
 The Government Printing Office is a unit of the legislative branch employing workers in the competitive service. See Joint Appendix (J.A.) 143. Authority to hire workers skilled in the printing trades is vested in the Public Printer, 44 U.S.C. § 305 (Supp. IV 1980). Wages are set by the Printer in conference with a "committee selected by the trades affected," subject to approval by the Joint Committee on Printing of the Congress, id. Workers from the printing trades at GPO, although they hold positions in the competitive service, are not covered by the civil service classification scheme, 5 U.S.C. § 5102(c)(9) (Supp. IV 1980); see J.A. 144.
 
 
 8
 As a result, mandates against discrimination by GPO have had a somewhat different history from mandates against discrimination in the Executive Branch. The original version of Title VII, although not authorizing suits against the federal government, commanded the President to use his authority to ensure equal employment opportunities within the federal government. Civil Rights Act of 1964 § 701(b), Pub.L.No.88-352, 78 Stat. 254. Under this authority, the President promulgated a succession of Executive Orders mandating equal opportunity. The first anti-discrimination proclamation to cover GPO specifically was Executive Order No. 11478, 34 Fed.Reg. 12,985 (1969), which applied to "those portions of the legislative and judicial branches of the Federal Government ... having positions in the competitive service and to the employees in those positions." In similar language, the 1972 Title VII amendment allowing suits against the federal government embraced GPO, 42 U.S.C. § 2000e-16(a) (1976), as did the 1974 extension of the right to sue the federal government under the Equal Pay Act. 29 U.S.C. § 203(e)(2)(A)(iii) (1976).
 
 
 9
 Aside from supervisory and managerial personnel, the GPO Bindery employs three classes of workers: journeymen bookbinders, journeymen bindery workers, and printing plant workers. J.A. 147. Journeyman bookbinder is a craft position, that is, a position requiring training in the trade, which in private industry typically is provided through union apprenticeships. Journeymen bindery workers and printing plant workers are classified noncraft by GPO and receive lower wages than bookbinders. J.A. 147-48. When this lawsuit began in 1974, all 279 bookbinders employed by GPO were male; by 1978, only one woman had joined the bookbinders' ranks. Conversely, all but one of the 325 bindery workers employed at GPO in 1974 were women. J.A. 146-47.
 
 
 10
 Some twenty-nine different machines in the GPO Bindery traditionally have been assigned to bookbinders. J.A. 153-54. These range from a complex mailer, operated by two bookbinders with three bindery workers and a printing plant worker, to simple, single operator machines such as perforators, paper folders, paper cutters, hole punchers, and machines for rounding book corners. Other bookbinder tasks include passport inspection (until 1978), covering passports and pamphlets by hand, gluing tablets, and occasional security detail. One group of bookbinders-the Library Section-hand binds, a craft occupation of the old-fashioned genre. Wages paid to craft bookbinders, however, do not vary with the tasks assigned. J.A. 148.
 
 
 11
 GPO divides the non-craft bindery workers into four grades, with increased wages for the higher grades. J.A. 148. Grade 2 bindery workers perform various hand work such as stitching and pasting. They load and unload larger machines in tandem with bookbinders, other bindery workers, or printing plant workers. Grade 2 bindery workers also inspect some finished work; in 1978, six were trained to inspect passports. Grade 3 bindery workers operate the oversewer and Singer sewing machines. J.A. 149-53. Grade 4 bindery workers operate manual and automatic feed Smyth sewing machines-multineedle machines for stitching and gluing bundles of pages together into what becomes the inside of a book. Grade 5 bindery workers are "bindery work leaders," who direct other bindery workers with the assistance of some Grade 3 workers. Bindery work leaders, however, have no classic supervisory authority such as control of leave, evaluation, or discipline. J.A. 149.
 
 
 12
 In general, both bookbinders and bindery workers are hired at GPO after experience in private industry. Bookbinders must have served a four-year apprenticeship or have the equivalent in practical craft experience. "The equivalent" means either training in hand bookbinding, or the ability to operate a folding or gathering machine and one other bookbinding machine. J.A. 155. Bindery workers, even those performing the simplest loading tasks, must have at least two years' experience in private industry. Although occasional instruction is provided on particular machines-and bindery workers allege that discrimination limits the training available-GPO with one exception operates no training program of its own. Employment in GPO thus mirrors employment practices in the private printing industry. Indeed, Kenneth Kingsbury, Superintendent of the GPO Bindery from 1970-77, testified that GPO followed industry and union practices in assigning work. Transcript (Tr.) Mar. 13, 1979, at 11.
 
 
 13
 The bookbinding industry has had a pervasive history of sex segregation. Work traditionally has been divided into "men's work" and "women's work," with the latter stereotypically including hand sewing and sewing machine operation. Industry unions have a similar history of segregation; the International Brotherhood of Bookbinders defined "men's work" and "women's work" separately until 1969, J.A. 165, when their constitution was amended to provide that "journeymen" and "journeywomen" classifications referred to operations performed rather than to the operator's sex. Plaintiffs' Exhibit 4, International Brotherhood of Bookbinders Book of Laws § 57 (1969). The union constitution continued, however, to stipulate different routes of entry into the trade for men and women, including registration procedures for "boys and men," the indenturing of male apprentices, and a four-year apprenticeship for men but a two-year apprenticeship for women. Id. §§ 52-54. Union segregation theoretically ended when the Bookbinders were merged into the Graphic Arts International in 1972, but the bookbinders and bindery workers at GPO were represented by separate, almost entirely single-sex locals until June, 1981.
 
 
 14
 The one departure from GPO's pattern of hiring from private industry was its craft apprenticeship program, begun about 1922 and discontinued in 1974. J.A. 151. The program took four years; salaries began at one-half the salary of the lowest-paid craft position and progressed to 90% of the lowest paid craft position by the fourth year. Tr. Mar. 16, 1979, at 101. Bindery workers who wanted to enter the apprenticeship program thus were obliged to take a pay cut, which they allege discouraged their entry. Bindery workers also contend that the four year requirement was unnecessary in light of their own required experience and training.
 
 
 15
 Beginning about 1969, GPO reserved some positions in the apprenticeship program for its own employees, with the asserted purpose of increasing minority representation in the program. Tr. Mar. 16, 1979, at 87-88. During the final years of the program, 1967-74, 475 men and 52 women (9.8%) entered. Thirty-five of the women in the program came from within GPO; six of these were former bindery workers. J.A. 134-42. Seventy-one men and only one woman were assigned to the Bindery.[2] GPO contends that the program was a major means for women to advance from within, a contention understandably disputed by the plaintiffs. Because almost no craft training was available to women in private industry, the apprenticeship program was the only route for women to gain craft status in the Bindery.
 
 
 16
 Before 1970, all GPO employees could compete for supervisory training by taking a test offered by GPO. In 1970, GPO restricted competition to administrative/clerical employees and craftsmen and discontinued the test. Tr. Mar. 16, 1979, at 112-13. In 1973, GPO limited competition yet further, to craftsmen only. As of October 1978, no women held supervisory positions in the Bindery. Only 65 (3.1%) of craft (including proofreader) or supervisory positions in the entire GPO production department-not just the Bindery-were held by women. J.A. 147.[3] Not surprisingly, the parties offer different explanations for the limitations on supervisor selection. GPO claims the qualifications were reasonable, while the plaintiffs claim that GPO acted to screen out qualified women applicants.
 
 B. The Lawsuit
 
 17
 The plaintiffs in this lawsuit have had a long day in court, compounded by extensive delays, proof complications, and the death of the original trial judge. The original complaint of sex discrimination was filed with GPO in May 1973. J.A. 46. After exhausting their administrative remedies without success, the plaintiffs brought suit under both Title VII and the Equal Pay Act in July 1974. J.A. 21. Their Equal Pay claim contended that the jobs of journeymen bindery workers were equal to some bookbinder jobs and sought recovery accordingly. Under Title VII, the plaintiffs objected to the denial of access to training, craft, and supervisory positions. Also under Title VII, they made the further, more sweeping contention that classifying bookbinders and bindery workers into separate craft and noncraft ladders was itself discriminatory.
 
 
 18
 The Title VII suit was conditionally certified as a class action in December 1974, with the class including all female journeymen bindery workers in the GPO Bindery. J.A. 125. After nearly four years of pretrial and discovery, the case was tried before Judge Waddy in March 1978. At the close of the plaintiffs' case, GPO moved for dismissal. Judge Waddy made an oral ruling that plaintiffs had shown no right to relief under the Equal Pay Act, but refused to grant GPO's motion as to the Title VII claims. J.A. II, 3-6.
 
 
 19
 Following Judge Waddy's death, the case was assigned to Judge Richey. He granted plaintiffs' motion for a new trial on both the Equal Pay Act and the Title VII claims. J.A. 157. The case was then retried in March 1979, resulting in the liability and relief orders now under review.
 
 
 20
 The substance of these liability and remedy orders can be summarized briefly. Under the Equal Pay Act, Judge Richey found a violation with respect to only one segment of the plaintiff class, the Grade 4 operators of the Smyth sewing machine. Other members of the plaintiff class-Singer and oversewing machine operators, passport inspectors, and handworkers-were denied Equal Pay Act relief. Because Judge Richey also found GPO's violation of the Equal Pay Act to be willful, the prevailing Equal Pay Act plaintiffs were awarded both ordinary and liquidated damages for the statutory maximum of three years.
 
 
 21
 Under Title VII, the entire class obtained partial recovery. Judge Richey found that GPO had engaged in a pattern and practice of discrimination by denying bindery workers access to craft training and craft and supervisory positions. He refused, however, to find a further Title VII violation in the GPO job classification system itself.
 
 
 22
 To remedy the Title VII violation, the district court fashioned a complex decree as follows:
 
 
 23
 (1) Back Pay. For each pay period, a pool was to be calculated by determining what women bindery workers would have earned during that period, had they filled one-half of all craft and supervisory positions in the Bindery opening after a specified date. The date specified was August 8, 1969, the date of the first Executive Order prohibiting discrimination in GPO but several years before the 1972 authorization of suits under Title VII against the federal government. J.A. 221. The pool was to be shared pro rata among all members of the plaintiff class working during the relevant pay period, with the exception of those who had already recovered back pay under the Equal Pay Act for the same period. The prevailing Equal Pay Act plaintiffs were to share in an analogously constructed back pay pool for supervisory positions only, in order to avoid double recovery.
 
 
 24
 (2) Front Pay. Because of the small number of vacancies in the Bindery, it will take some time before bindery workers can make up for opportunities lost in the past. To compensate for this continuing loss, Judge Richey also designed a front pay pool. The front pay pool was to be calculated by taking the total of what bindery workers would have earned had they filled half of all craft and supervisory positions in the Bindery. All obligation on the part of GPO to pay front pay was to terminate when women held one-half of all craft and supervisory positions in the Bindery. J.A. 221. The front pay pool was to be shared on a pro rata basis, with bindery workers entitled to share until they received craft training. No front pay pool was constructed for plaintiffs who prevailed under the Equal Pay Act.
 
 
 25
 (3) Injunctive Relief. GPO was enjoined from future discrimination in wages, training opportunities, work assignment or promotions. To remedy the denial of training opportunities, GPO was prohibited from hiring bookbinders or craft trainees from outside GPO, until all bindery workers had been offered the opportunity to receive craft training. To remedy the foreclosure of supervisory opportunities, three-fourths of all supervisory openings in the GPO Bindery were to be filled from the plaintiff class, assuming the availability of qualified applicants. This ratio for hiring supervisors was to continue until women held one-half of all supervisory positions in the Bindery, or until a promotion plan acceptable to plaintiffs or the district court was established. J.A. 223, 232.
 
 
 26
 We affirm the district court's Equal Pay Act judgments in their entirety. With respect to Title VII, we affirm the district court's finding that GPO was liable for discriminatory denial of both craft training opportunities and supervisory promotions. We also affirm the district court's refusal to find GPO had violated Title VII by maintaining the craft/non-craft classification system itself.
 
 
 27
 We applaud the ingenuity and thoughtfulness with which the district court designed a structure for Title VII relief in this complex fact situation. We affirm the structure in its basic outlines, including the method for calculating and sharing back pay and front pay. We reverse and remand, however, with directions concerning certain aspects of the relief. First, the district court is directed to calculate the front pay pool as a continuation of the back pay pool, mirroring the back pay formula. Second, the district court is directed to set a more limited outside termination date for GPO's obligation to pay front pay. Third, the district court is directed to construct a front pay pool to compensate prevailing Equal Pay Act plaintiffs for the denial of supervisory opportunities, analogous to the back pay pool set up for them. Finally, the injunctive decree is remanded, with directions to the district court to fashion more limited craft training and supervisory hiring goals, within guidance provided by this opinion.
 
 III. THE CLAIM UNDER THE EQUAL PAY ACT
 A. Procedural Preliminaries
 
 28
 Two preliminary procedural difficulties with the Equal Pay Act claim can be handled quickly. GPO contends that Judge Richey erred in ordering a new trial on the Equal Pay Act issues, rather than entering judgment for GPO on the basis of Judge Waddy's oral ruling. Plaintiffs contend that Judge Richey erred in following Judge Waddy's decision not to order notice of the Equal Pay Act claims to class members or to allow filing of consents retroactive to the initial date of filing. Record (R.) 218A, J.A. 158. We affirm Judge Richey on both points.
 
 
 29
 1. The Retrial. At the close of the plaintiffs' case in the first trial, Judge Waddy dismissed the claim for relief under the Equal Pay Act on GPO's motion pursuant to Fed.R.Civ.P. 41(b) (allowing dismissal if upon the facts and the law the plaintiff has shown no right to relief). Judge Waddy's ruling from the bench was accompanied by a definition of the plaintiffs' Equal Pay Act burden and oral "findings of fact," and a promise to reduce both to writing. Tr. Mar. 28, 1978, at 2-14, J.A. II, 1-13. GPO complains that Judge Richey was obligated to enter judgment on the Equal Pay Act dismissal and inadequately explained his reasons for vacating the dismissal. GPO Brief at 13, 26; GPO Reply Brief at 6-11. Neither contention has merit.
 
 
 30
 The federal rules treat the death or disability of the trial judge as follows:
 
 
 31
 If by reason of death, sickness, or other disability a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.
 
 
 32
 Fed.R.Civ.P. 63. If the trial judge in a non-jury trial becomes disabled before filing findings of fact and conclusions of law, a new trial is probably obligatory, absent consent of the parties to a decision without retrial.[4] GPO contends that Judge Waddy's findings of fact and conclusions of law issued from the bench sufficed to permit Judge Richey to enter judgment. We need not reach this issue, however, because Rule 63 at most gives a successor judge the power to enter judgment;[5] it does not obligate him to do so.[6] The premise underlying Rule 63-that the successor judge may be unable to assess with security the significance or credibility of what his predecessor heard-is amply justified in complex litigation such as this. We note particularly with respect to this case that 1) a motion to reconsider the Equal Pay Act bench ruling was sub judice when Judge Waddy died; 2) Judge Waddy was unable to amplify his findings as he announced he would; and 3) under Fed.R.Civ.P. 54(b), it would have been open to Judge Waddy to reconsider and revise the Equal Pay ruling at any time before entry of judgment on the Title VII claim.
 
 
 33
 GPO further contends that Judge Richey did not make "findings" adequate to support his order of a new trial. As Rule 63 allows a successor judge to order a new trial when his predecessor issued oral rulings, there would appear to be no need for the findings GPO demands. We therefore hold that Judge Richey properly exercised his discretionary power under Rule 63 to order a new trial of the Equal Pay Act claims.
 
 
 34
 2. Retroactive Consent Under the Equal Pay Act. Suits for recovery under the Equal Pay Act differ from the mainstream of class actions under the Federal Rules. Under the Equal Pay Act, members of the class may recover only if they file consents to join the class of parties plaintiff, 29 U.S.C. § 216(b) (Supp. III 1979). Conversely, members who do not "opt in" to the Equal Pay Act class will not be bound by a decision as to other plaintiffs. See, e.g., LaChapelle v. Owens-Illinois, Inc., 513 F.2d 286, 288 (5th Cir. 1975). Class actions brought under Fed.R.Civ.P. 23(b)(3), such as Title VII suits in which monetary relief is sought, by contrast are "opt-out" suits, binding and benefiting all members of the class who do not specifically request exclusion. Under the Federal Rules, two different kinds of notice may be appropriate in "opt-out" class action suits. First, members of the potential class are to be sent "the best notice to all members who can be identified through reasonable effort," of the pendency of the suit and the fact that they will be bound unless they opt out. Fed.R.Civ.P. 23(c)(2). Second, they may be notified of the implications of the suit for other legal rights that they may have. Fed.R.Civ.P. 23(d)(2) (requiring notice "for the protection of the members of the class or otherwise for the fair conduct of the action").
 
 
 35
 After conditional certification of their Title VII suit as a class action under Rule 23, plaintiffs moved to have notice of the pendency of the Equal Pay Act claims sent to all potential plaintiffs pursuant to Rule 23(d). R. 28. Judge Waddy denied the motion, J.A. 127, as the trial judge may do if notice appears unnecessary to protect the rights of others or conduct the lawsuit fairly. After the second trial, but before any decision was rendered, plaintiffs moved Judge Richey to require distribution of notice of the Equal Pay Act claims and to allow consents to be filed retroactively. R. 148.[7] Judge Richey denied the motion, stating that he "declined" in this instance to depart from the "law of the case" declared by Judge Waddy. J.A. 159. On this appeal, the plaintiffs contend that Judge Waddy's original ruling was in error, and should be reversed together with Judge Richey's perpetuation of it.
 
 
 36
 We in turn decline to disturb Judge Richey's ruling. Although Rule 63 allows a successor to a disabled judge to order a new trial, this grant of power does not encompass relitigation of all issues decided by the predecessor judge. The policy behind Rule 63 is that the successor judge, not having heard witnesses at the trial, may be unable to resolve issues of credibility. 7 J. Moore, Federal Practice P 63.05 (2d ed. 1979); 11 C. Wright & A. Miller, Federal Practice & Procedure § 2922 (1973). See also FDIC v. Siraco, 174 F.2d 360 (2d Cir. 1949). Rule 63 "is not an invitation to reargument before a new judge of legal questions that had been determined by the original judge." 11 C. Wright & A. Miller § 2922 (1973).
 
 
 37
 It is true that the doctrine of the law of the case, unlike res judicata but like stare decisis, does not preclude reconsideration of erroneous decisions. See 1B J. Moore, Federal Practice P 0.04 (2d ed. 1980). While judicial deference to colleagues is desirable to deter "judge-shopping," reconsideration of errors may be especially appropriate where the predecessor judge cannot perform the task himself. See 18 C. Wright & A. Miller § 4478 (1980); Vestal, Law of the Case: Single-Suit Preclusion, 1967 Utah L.Rev. 1, 17. However, given the fact that consent forms were circulated by the bindery workers' union, R. 31, we are not compelled to conclude that Judge Waddy committed reversible error in refusing to order that Rule 23(d) notice of the pendency of the Equal Pay Act claims be sent. We therefore uphold Judge Richey's refusal to depart from the "law of the case" in this instance.[8]
 
 B. Liability Under the Equal Pay Act
 
 38
 An employer violates the Equal Pay Act by paying unequal wages for "equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1) (1976). Determination that an Equal Pay Act violation has occurred involves both a legal and a factual problem. The legal issue is the standard of equality to be applied under the Act. The factual issue is whether the jobs in question met the standard, and the burden of proof is on plaintiffs to show that they did. Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 448 (D.C.Cir.1976). Once plaintiffs meet their burden, the burden then shifts to defendants to show that the pay differential was justified under one of the exceptions to the Act, Corning Glass, 417 U.S. at 205, 94 S.Ct. at 2233; Laffey, 567 F.2d at 448. With respect to plaintiffs' burden, GPO alleges both that the trial judge employed the wrong legal standard and that his finding that plaintiffs had met their burden for operators of the Smyth sewing machine was clearly erroneous. GPO also claims to have rebutted plaintiffs' case by showing that traditional industry classifications and training requirements justified the differential. The plaintiffs contend that they met their burden not only as to the Grade 4 bindery workers, but with respect to other bindery workers whose Equal Pay case was unsuccessful in the district court: The oversewer and Singer machine operators, handworkers, and passport inspectors.
 
 
 39
 1. The Legal Standard. Like most legislation, the Equal Pay Act of 1963 was a compromise. Congress for several years had considered competing versions of what ultimately became the Act. Some versions sought to prohibit unequal pay for comparable work; this approach had been used during World War II by the National War Labor Board. S.Rep.No.176, 88th Cong., 1st Sess. 3 (1963) (hereinafter, Senate Report ). Other versions sought only to prohibit unequal pay for equal work. "Equality" prevailed, in the main to avoid imposing job comparisons on employers. See, e.g., 108 Cong. Rec. 9196 (1963) (Remarks of Rep. Frelinghuysen); id. at 9209 (Remarks of Rep. Goodell).
 
 
 40
 Although passing the more limited statute, Congress recognized the disputatious nature of the term "equality." Sponsors of more extensive versions of the bill were careful to emphasize that "equality" did not mean "identity": "it is not the intent of the Senate that jobs must be identical. Such a conclusion would obviously be ridiculous." Id. at 9761 (Remarks of Sen. McNamara). Sponsors in the House, although anxious to emphasize the limited nature of the bill, also used language short of absolute identity:
 
 
 41
 I think it is important that we have clear legislative history at this point. Last year when the House changed the word 'comparable' to 'equal' the clear intention was to narrow the whole concept ... the jobs involved should be virtually identical, ... very much alike or closely related to each other.
 
 
 42
 Id. at 9197 (Remarks of Rep. Goodell). The legislative history thus contains ammunition both for those who would insist on a very narrow reading of "equality," and for those who would urge a more expansive understanding of the term.[9]
 
 
 43
 Congress did not, however, leave interpretation of the diffuse term "equal" completely unchannelled. It wrote four aspects of equal work into the statute itself: equal skill, effort, responsibility, and working conditions. These factors are commonly used in job evaluation as practiced by industrial engineers, and Congress clearly intended the statute to be interpreted in light of this body of expertise.[10]
 
 
 44
 In applying the term "equal work," courts have been led by the legislative history toward a "substantially equal" test, a middle course between a requirement that the jobs in question be "exactly alike" and a requirement that they be merely "comparable."[11] This middle path was adopted by implication by the Supreme Court in its only full-scale treatment of the Equal Pay Act, Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). In addition to normal shift differentials, Corning paid a higher base wage to male inspectors on the night shift than to female inspectors on the day shift. The differential was a relic of the days when it was necessary to recruit men to work at night because women were prohibited from doing so by state statutes. In finding a violation of the Equal Pay Act, the Court interpreted the statutory factor of "working conditions" in light of its meaning in job evaluation plans, which generally confine the meaning of "working conditions" to job surroundings and hazards, id. at 202, 94 S.Ct. at 2231. Because night work and day work are different in one respect-the time of performance-Corning Glass implicitly rejected an Equal Pay Act standard of virtual identity, although the case did not explicitly formulate an Equal Pay Act test.
 
 
 45
 Laffey v. Northwest Airlines, Inc., 567 F.2d 429 (D.C.Cir.1976), the leading Equal Pay Act case in this circuit, adopted the "substantially equal" test in reliance on Corning Glass. Our discussion of the test read in full:
 
 
 46
 For "(it) is now well settled that jobs need not be identical in every respect before the Equal Pay Act is applicable"; (citing Corning Glass ) the phrase "equal work" does not mean that the jobs must be identical, but merely that they must be "substantially equal." A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities.
 
 
 47
 567 F.2d at 449 (citations omitted). The "substantially equal" test has now been adopted by every other circuit to pass on the question.[12] Judge Richey employed this test in the case at bar, J.A. 195, and we reaffirm our approval of it.
 
 
 48
 This case, however, presents a difficult and largely unexplored problem in the interpretation of the Equal Pay Act: whether work may be substantially equal, in spite of the fact that it is performed on different machines.[13] Bindery worker Grade 4s work on the Smyth sewing machine; bookbinders do not. GPO contends that this fact is sufficient as a matter of law to preclude the finding of an Equal Pay violation. Judge Richey concluded that it was not, and that work on the Smyth was sufficiently like the work performed by bookbinders on other machines as to allow relief under the Act. J.A. 195.
 
 
 49
 In determining that work on different machines could be "substantially equal," Judge Richey was guided by Department of Labor regulations:
 
 
 50
 (T)he performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply.
 
 
 51
 29 C.F.R. § 800.123 (1980). This court has paid substantial deference to Department of Labor regulations in interpreting the Act, see Laffey, 567 F.2d at 449,[14] and we continue to do so.
 
 
 52
 Congress never specifically considered whether work performed on different machines might be equal for purposes of the Equal Pay Act.[15] To refuse to find work "equal" merely because it is performed on different machines, however, would be to insist on the requirement of exact identity declared "obviously ridiculous" by Senator McNamara and rejected by all of the courts treating the subject. See supra at 271, 272 n.12. The result would be largely to foreclose application of the Act whenever machines are involved-an evisceration of the Act clearly at odds with Congress' broad remedial goals. See Senate Report at 1; House Report at 2. For example, different typewriters, power saws or automobiles are different machines.
 
 
 53
 Moreover, the very fact that Congress chose to channel the term "equality" by the language of job evaluation programs presupposes a recognition that jobs can be substantially equal even though performed with different equipment or machines. Job evaluation plans focus on experience, skill, surroundings, and responsibility and clearly contemplate assigning common classifications to work on related, albeit different machines.[16] Along these lines, in the congressional debates Representative Goodell presented guidelines for the interpretation of job content that emphasized that jobs be "normally related" and "fall within closely related job classifications"-both descriptions that apply easily to different components of a single productive process. Of course, work on different machines can differ radically; Representative Goodell used the example that driving a truck would not be equal to piloting a tug boat. 109 Cong.Rec. 9209 (1963). The question in every Equal Pay Act case is simply whether the jobs in question are sufficiently related and sufficiently similar in skill, effort, responsibility, and working conditions, as to be substantially equal.
 
 
 54
 2. The Facts of This Case and the Standard of Review. The trial judge's findings of fact in an equal pay case are like any other finding of fact; they may be overturned on appeal only if clearly erroneous. Fed.R.Civ.P. 52(a); see, e.g., United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); Laffey, 567 F.2d at 453; Kinsey v. First Regional Securities, Inc., 557 F.2d 830, 835-36 (D.C.Cir.1977); Causey v. Ford Motor Co., 516 F.2d 416, 420 (5th Cir. 1975). Judge Richey did not err in finding that GPO violated the Equal Pay Act with respect to bindery workers operating the Smyth sewing machine but not with respect to other bindery worker machine operators, handworkers, and passport inspectors.
 
 
 55
 a. Bindery Work Operators of the Smyth Sewing Machine. The Smyth sewing machine is a multi-needle machine for sewing groups of pages ("signatures") together into what we would recognize as the "inside" of a book. The operator of the Smyth chooses the number of needles required for a particular job and sets thread and bobbin tension for each needle. She also sets the needles to position stitching properly along the spine of the book and sets guides to position signatures as they are sewn together. She is responsible for routine maintenance tasks such as changing needles and oiling and cleaning the machines. In operating the machine, she opens signatures and places them on a "pusher." Because the operator does not control the pace of the pusher, considerable dexterity is required to feed at the proper rate. The Smyth also runs paste along the spine of the book to ensure additional strength; the Smyth operator must coordinate a cutter at the proper moment when the "inside" of a particular book is sewn together. Tr. Mar. 8, 1979, at 55-65.
 
 
 56
 In finding that plaintiffs had met their Equal Pay Act burden to prove substantial equality between the jobs of the Smyth operators and bookbinders, Judge Richey relied heavily upon the testimony of plaintiffs' expert witness, James O'Connell, that operation of the Smyth is substantially equal to operation of many bookbinder machines. J.A. 186. He viewed O'Connell's testimony as buttressed by the testimony of plaintiffs' other expert, Bertram Gottlieb, and the testimony of journeymen bindery workers, bookbinders, and GPO officials. J.A. 166-72, 176-79, 186-87. Judge Richey discounted the testimony of defendant's expert Irwin Lazarus, upon finding flaws both in his methodology and its execution. J.A. 173-76. While GPO sought to question Mr. O'Connell's qualifications as an expert, Tr. Mar. 15, 1979, at 263-305, Mr. O'Connell was the personnel management specialist chosen by the Civil Service Commission to review GPO job classifications after plaintiffs filed their administrative complaint. GPO is hard pressed to attack the credentials of the expert assigned by the government to this case. In any event, it is not for us to second-guess reasonable judgments by the trial judge with regard to the weight to be accorded expert testimony.
 
 
 57
 Because he had been assigned to investigate the administrative complaint of Smyth operators, Mr. O'Connell compared the job of operating the Smyth to a wide range of bookbinder jobs. He initially determined that the Smyth's creation of a book's "inside," and bookbinder tasks such as folding and cutting signatures, making a book cover ("case") and "casing" the inside into the cover, were an integral part of the same productive process. Id. at 21. He noted their physical and organizational proximity and that they involved similar functions: gluing, stitching, cutting, and putting together the parts of a book. Within the process, Mr. O'Connell observed the Smyth and twenty-five bookbinder machine operations, to determine whether they involved similar difficulty, responsibility, and qualifications. Id. at 9, 70. He characterized the Smyth operation as more like many bookbinder jobs than the latter were like each other. The Smyth, he concluded, "was in the middle range of difficulty, responsibility and qualification requirements of bookbinder machine operations." Id. at 20.
 
 
 58
 Cross-examination did elicit the admission that Mr. O'Connell had given similar "effort" ratings to the Smyth and a cloth cutter that required loading 100-lb. bolts in order to position them for cutting. Id. at 109. There is dispute about the extent to which different kinds and amounts of effort may be compared for purposes of a finding of "equality" under the Equal Pay Act.[17] The Department of Labor regulations define "effort" to include both mental and physical exertion, and allow effort of different kinds to be balanced in application of the Act, 29 C.F.R. § 800.127 (1980). To illustrate, the regulations suggest that the effort of a male checker who sometimes carries heavy packages may be equated with the effort of a female checker who sometimes performs fill-in work requiring greater dexterity, whereas a regular additional task of lifting from an assembly line could justify a wage differential. Id. § 800.218. GPO, disputing this approach, contends that jobs are substantially equal only if they involve effort of the same kind.[18]
 
 
 59
 We need not reach this troublesome issue of how effort is to be defined. Cross-examination did not raise similar questions about the other bookbinders' machines to which plaintiffs' experts favorably compared the Smyth. To prove a violation under the Equal Pay Act, plaintiffs need only show their jobs were equal to the jobs of some bookbinders, but treated unequally. Plaintiffs need not show that their jobs were substantially similar to all, or even most bookbinder jobs. Id. § 800.238; Laffey, 567 F.2d at 450; Shultz v. Wheaton Glass Co., 421 F.2d 259, 264 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); Elisburg, Equal Pay in the United States: the Development and Implementation of the Equal Pay Act of 1963, 29 Lab. L.J. 195 (1978). For purposes of an Equal Pay Act violation, it is irrelevant that GPO classifies the bookbinder jobs that resemble plaintiffs' together with other jobs that do not. The testimony of the plaintiffs' expert witnesses supports a finding that the Smyth operators' jobs were substantially equal to the jobs of some bookbinders. Operators of the Smyth sewing machine, therefore, carried their burden of establishing a prima facie case of an Equal Pay Act violation by GPO.
 
 
 60
 GPO makes two other objections to the plaintiffs' prima facie showing. First, GPO contends that bookbinders have supervisory authority over bindery workers with whom they work and thus more responsibility than Smyth operators. The trial judge's finding that bookbinders do not have supervisory authority, however, J.A. 188-89, is securely based in the trial record. For example, a Bindery superintendent, Kenneth Kingsbury, testified that bookbinders neither disciplined the bindery workers with whom they worked, nor were held accountable for their mistakes. Tr. Mar. 13, 1979, at 13-14. Moreover, quite a number of the bookbinders' machines to which the Smyth was compared favorably were operated by a single bookbinder, and thus presented no opportunity for direction of the work of others.
 
 
 61
 Second, GPO alleges that the plaintiffs' experts mistakenly compared single operations rather than entire jobs. Judge Richey, however, found explicitly that rotation among operations was not required of bookbinders. J.A. 176. His finding is amply supported by the trial testimony. Mr. Kingsbury testified that bookbinders normally had a regular assignment and that operators of major machines rarely changed assignments. Id. at 15-25. Assignments were cemented by seniority, and it was not unusual for bookbinders to spend entire careers in the same section of the Bindery. Id. at 16, 32. Mr. Kingsbury admitted that GPO had not formally studied the need for back-up rotation and had kept no formal statistics on bookbinder assignments. Id. at 17, 59. Ammi Potter, Mr. Kingsbury's successor as Bindery Supervisor, also testified that GPO had not evaluated whether it could operate with bookbinders who operated only one machine, Tr. Mar. 14, 1979, at 25-27. While it appears that as GPO's work force contracts, rotation may become more important, id. at 29-30, the record does not show that Judge Richey erred in concluding that rotation was not a necessary part of all bookbinders' jobs during the time the alleged violations of the Equal Pay Act took place.
 
 
 62
 We conclude that the plaintiffs succeeded in proving a prima facie case of an Equal Pay Act violation with respect to the Smyth operators. Once the plaintiffs have made out such a prima facie case, the burden shifts to the defendants to show that their payment of unequal wages was justified under one of the exceptions enumerated in the statute: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1) (1976); Corning Glass, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1. Judge Richey found that GPO's "only defense is that the bookbinder's job involves a four year apprenticeship requirement in the form of a training program that has traditionally excluded women" and that the burden had not been met. J.A. 187. In this appeal, GPO contends that traditional industry patterns of classification and training are a differential based on a factor other than sex, and hence a defense to the Equal Pay Act charge.
 
 
 63
 Traditional industry practice was certainly the kind of difference contemplated as a factor "other than sex" under the Equal Pay Act. As Representative Goodell remarked, "Differences in pay that are based upon historical and widely accepted differences in job content will not be challenged, if not based on sex." 109 Cong.Rec. 9209 (1963) (emphasis added). Traditional industry practice may reveal continuing fealty to sexual discrimination, however, and if so does not shield employers against the charge of an Equal Pay Act violation. E.g., Corning Glass, 417 U.S. at 205, 94 S.Ct. at 2233; Laffey, 567 F.2d at 451. For example, the "traditions" of paying women less than men, or of assigning different labelling to female and male jobs, no matter how hoary, are not defenses to the Equal Pay Act. To hold otherwise would protect the most egregious forms of discrimination, merely because, like Faulkner's Dilsey, they have endured.
 
 
 64
 The differences in machine assignments and training opportunities found at GPO were certainly longstanding in the binding industry. The record amply reveals, however, that these differences constituted a continuing structure of sexual discrimination. See supra pp. 265-266. The history of the binding industry, therefore, does not provide GPO with a defense to the Equal Pay Act violation charged here. We affirm Judge Richey's conclusion that GPO failed to rebut the plaintiffs' prima facie case that GPO violated the Equal Pay Act with respect to the Smyth operators.
 
 
 65
 b. Operators of Other Machines. The multi-needle oversewer machine cross-stitches the spine of a book, producing the stiff back characteristic of rebound volumes. The oversewer is less difficult to set up and considerably less difficult to operate than the Smyth. The oversewer operator does not open signatures, cut, or paste, and she controls the pace of the machine. The Singer is a heavy-duty version of the home favorite and performs straight, single-needle stitching. At GPO, it was used to sew the backs of passports, but has been replaced by automation and is now used only for occasional repairs.
 
 
 66
 The plaintiffs' expert O'Connell did not make a study of the oversewer or the Singer. The plaintiffs' case as to these machines depended solely on the testimony presented by their expert Gottlieb. Judge Richey found Mr. Gottlieb's testimony insufficient to "support a threshold determination that the two jobs subsequently equated are substantially the same." J.A. 196. The record supports his conclusion, see, e.g., Tr. Mar. 8, 1979, at 72-73.
 
 
 67
 c. Handworkers. Handwork tasks performed by bindery workers include loading machines, inspecting products, gluing maps into books, and handsewing book spines. Bookbinders, too, are assigned a variety of handwork. One of the simplest of these tasks is making tablets by smearing glue along the edge of a stack of paper. The most difficult bookbinder hand tasks are performed in the library section, where books such as gold-embossed special editions are made. Both sides agree that the library handicraft cannot be compared to any bindery worker tasks; only Judge Richey's refusal to compare bindery workers' hand tasks with the simpler bookbinder operations is at issue here.
 
 
 68
 Judge Richey's findings of fact relied on the statement by the plaintiff's expert O'Connell that bindery worker hand tasks and even the simple bookbinder tasks were too disparate to be compared "in absolute terms." J.A. 172. Although the plaintiffs' expert Gottlieb did compare the hand tasks, as Judge Richey also noted, we cannot second-guess the weight assigned expert testimony by the trial judge. We therefore affirm Judge Richey's holding that the handworkers should not recover under the Equal Pay Act.
 
 
 69
 d. Passport Inspectors. Replacing a male in the same job with a lower-paid female, or vice versa, is one of the most glaring violations of the Equal Pay Act. 29 C.F.R. § 800.114(c) (1980). E.g., DiSalvo v. Chamber of Commerce, 568 F.2d 593 (8th Cir. 1978); Hodgson v. American Bank of Commerce, 447 F.2d 416 (5th Cir. 1971). The female, however, must replace the male in the same job. The Equal Pay Act compares jobs, not tasks; an employer does not violate the Act by merely shifting a task to the employee receiving the lower salary, 29 C.F.R. § 800.119 (1980).
 
 
 70
 Before September 1978, the job of inspecting passports was performed by two bookbinders, one assigned to each passport team. In September 1978, GPO began training bindery workers to inspect passports; six were trained, and they performed the task on rotation. J.A. 172. Plaintiffs challenge Judge Richey's refusal to find that the reassignment violated the Equal Pay Act. Brief for Plaintiffs at 111-12.
 
 
 71
 The plaintiffs in this case made a clear showing that the task of passport inspection had been reassigned to bindery workers, with an increase in production quotas besides. They failed, however, to show that the female passport inspectors had stepped into formerly male jobs. Bookbinders inspected passports on a nearly full-time basis. When not needed in the passport cage, they rotated to some of the simpler bookbinder operations such as making pads or operating the round corner machine. Tr. Mar. 14, 1979, at 39. Bindery workers, however, were assigned to inspect passports approximately every two weeks, and in the interim joined a labor pool of bindery workers available for assignment to any bindery worker operation at GPO. Id. at 54, 64. The plaintiffs made no showing of what portion of their time bindery workers devoted to inspecting passports; for all we are told, it could have been as little as one-third. Without a showing that they had been assigned passport inspection nearly full time, as had the bookbinders, the plaintiffs did not create a record that mandates the conclusion that they had taken over a bookbinder job. We thus cannot find clear error in Judge Richey's failure to find that the reassignment violated the Equal Pay Act.
 
 C. The Remedy Under the Equal Pay Act
 
 72
 An employer who violates the Equal Pay Act is subject to the remedial provisions of the Equal Pay Act's statutory parent, the FLSA. For relief purposes, the FLSA does not distinguish between wages that were sexually discriminatory and wages that were deficient for other reasons, such as a failure to reach the current minimum. 29 U.S.C. § 206(b) (Supp. III 1979). The remedial provisions of the FLSA originally were simple: an employer was doubly liable to affected employees: for unpaid wages and an additional, equal amount in liquidated damages. 29 U.S.C. § 216(b), (c) (Supp. III 1979). In the original FLSA both awards were mandatory. Pub.L.No. 718, 52 Stat. 1069 (1938). Concerned that this remedial provision was sometimes unjustly harsh, Congress amended the FLSA by two provisions relevant here, Portal to Portal Pay Act of 1947 (Portal Act), Pub.L.No. 49, 61 Stat. 84 (1947). First, the Portal Act limited FLSA recovery to two years, or three years in the event of a willful violation. 29 U.S.C. § 255(a) (1976). For a named plaintiff, this period is calculated from the date suit was filed; for others, it is calculated from the date they "opted into" the lawsuit, id. § 216(c) (Supp. III 1979). Second, awards of liquidated damages are no longer mandatory. If the employer convinces the court that he paid the deficient compensation in good faith and had reasonable grounds for believing he was in compliance with the FLSA, the court has discretion to forego any or all of the allowable award of liquidated damages. Id. § 260 (1976).
 
 
 73
 In the case at bar, Judge Richey awarded the Smyth operators the difference between their actual wages and what they would have earned as bookbinders. J.A. 220. Because he found GPO's violation of the Equal Pay Act willful, J.A. 197, he specified that plaintiffs could recover back wages up to a limit of three years before the date they consented to join the suit. J.A. 216. He also awarded full liquidated damages to each Smyth operator. J.A. 220.
 
 
 74
 GPO raises interlocking objections to this remedial decree. First, GPO objects that Judge Richey's award of Equal Pay Act relief extends retroactively in some cases more than two years before the FLSA governed GPO.[19] GPO also urges us to rescind the award of liquidated damages, contending that it acted in good faith. Finally, GPO contends that the FLSA forecloses a retroactive award of liquidated damages here, because GPO had the best of all reasons for believing that its actions were not illegal under the FLSA-namely, that GPO was not covered by the FLSA. We dispose of these contentions in turn.[20]
 
 
 75
 1. Retroactive Liability Under the FLSA Amendments of 1974. Courts often must decide whether a lawsuit is properly resolved under legal rules that were adopted after the controversy arose. A basic rule applied to this problem of retrospectivity is the sensible accommodation that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Bradley v. School Board of the City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (award of attorneys fees incurred in 1971 authorized by the Education Amendments of 1972).[21] Since every statute must pass constitutional muster, one outer boundary of this doctrine is set by the constitutional prohibition of ex post facto laws-a prohibition that has been interpreted to bar the retroactive imposition of penal liability.[22] To conclude that the period of GPO's liability under the 1974 FLSA amendments may extend before 1974, we must therefore resolve three questions: first, whether the legislative history of the amendments prohibits their retrospective application in this manner; second, whether the application would result in manifest injustice; and finally, whether the application would run afoul of the constitutional prohibition of ex post facto laws. We begin with the legislative history.
 
 
 76
 Neither statutory language nor legislative history contains the slightest hint that Congress intended to prohibit retroactive application of the 1974 extension of the FLSA to federal employees. The extension of FLSA coverage to the federal government was but a small part of Congress' general aim
 
 
 77
 to incorporate into the Fair Labor Standards Act a breadth of coverage and a minimum wage level sufficient to bring the Act closer to meeting its basic stated objective-the elimination of labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well being of workers.
 
 
 78
 Fair Labor Standards Amendments of 1974, S.Rep.No.690, 93d Cong., 2d Sess. 1-2 (1974); see also H.R.Rep.No.913, 93d Cong., 2d Sess. 9 (1974) U.S.Code Cong. & Admin.News p. 2811. The Amendments' sponsors emphasized that the legislation was intended to be comprehensive. E.g., 120 Cong.Rec. 4702 (1974) ("Coverage should be interpreted broadly; and every effort should be made to insure that those employees who have been victims of violations of this act are made whole.") (Remarks of Sen. Williams). Moreover, similar amendments passed in 1973 had been vetoed by President Nixon, 119 Cong.Rec. 37,719 (1973), and Congress regarded the 1974 package as long overdue. S.Rep.No.690, 93d Cong., 2d Sess. 3 (1974); H.R.Rep.No.913, 93d Cong., 2d Sess. 4 (1974).
 
 
 79
 Although other features of the 1974 Amendments, such as the extension of FLSA coverage to domestic workers, were highly controversial, the extension to federal employees was not debated extensively. Once concerns about conflict with the civil service statutes has been allayed by bringing administration of the extension under the Civil Service Commission, see S.Rep.No. 690 at 23; H.R.Rep.No. 913 at 29, the extension passed Congress almost without discussion. All seemed to agree that the federal government should be held to the standards that it, in turn, imposed upon private industry. E.g., 120 Cong.Rec. 4697 (1974) (Remarks of Sen. Williams). The congressional debates contain no mention of retrospectivity as a potential problem, and indeed contain no mention of the fact that the Amendments would bring the federal government within the reach of the Equal Pay Act.
 
 
 80
 In contrast, Congress was troubled by the potentially harsh impact of implementation of some of the other 1974 Amendments. For example, the Amendments attempted to bring municipal policemen and firemen within the scope of the FLSA. Concerned that FLSA overtime pay requirements would impose hardship on local governments, Congress provided specifically for the phase-in of the requirements. Pub.L.No. 93-259, 88 Stat. 60-61; S.Rep.No. 690 at 24; H.R.Rep.No. 913 at 29. See also 120 Cong.Rec. 5734 (1974) (Remarks of Sen. Williams). Congress cushioned the impact of the 1974 Amendments when it found reason to do so; yet Congress appears to have found no reason to insulate the federal government against the immediate impact of the provisions of the FLSA, including the Equal Pay Act. The legislative history thus clearly permits the retrospective reach of the Equal Pay Act remedy.
 
 
 81
 Our second matter of inquiry is whether it would be "manifestly unjust" to apply the 1974 FLSA Amendments to GPO retrospectively. We perceive no manifest injustice in doing so. Bradley outlined a three factor test of when it is unjust to apply legal rules to controversies that antedate them: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019.
 
 
 82
 Under the "nature" and "identity" of the parties, the Bradley court considered the balance of power between the parties and the interests advanced on both sides. In Bradley, the plaintiffs were children asserting their constitutional rights against a discriminatory public school system. The Court found no injustice in imposing a statutory award of attorneys' fees retroactively against such a defendant. Our situation is parallel. The plaintiffs are working women who have been unfairly denied wages by their own government. The defendant, GPO, is hardly the innocent actor being subjected to surprising and unexpected obligations. At least from 1969 on, see infra at p. 288, it had been told not to discriminate as it was found to have done. The nature of the parties in this litigation cuts in favor of retroactive application of the 1974 FLSA amendments to GPO.
 
 
 83
 Bradley next admonished that the nature of the parties' rights and the effect on such rights must be factored in. Retrospective application of a statute has been found manifestly unjust when it would deprive individuals of vested rights. For example, in Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), the Court refused to deny monetary restitution to a federal employee who had received a final ruling in his favor, even though regulations had changed in the interim. GPO, by contrast, has never had a right to discriminate, even though sovereign immunity for a long time insulated GPO from liability for its transgressions.[23] Imposing pre-1974 liability on GPO will not violate GPO's rights; it will vindicate plaintiffs' rights to be free of discrimination. Nor will it adversely affect the rights of other GPO employees. We therefore find no injustice in imposing the full three-year period of FLSA liability upon GPO.
 
 
 84
 Our final inquiry is whether application of the 1974 Amendments to allow plaintiffs to recover for a period before 1974 would run afoul of the constitutional ban on ex post facto laws. As the ban has been interpreted to bar only retroactive penal liability, we must consider whether monetary awards under the FLSA are appropriately characterized as penal, or as merely compensatory for the purpose at hand.
 
 
 85
 The original FLSA mandated courts to award prevailing plaintiffs both unpaid wages and liquidated damages. Pub.L.No. 718, 52 Stat. 1069 (1938). Whereas the wage award clearly compensates employees for lost pay, the award of liquidated damages might appear aimed to deter or penalize wayward employers. Almost immediately after the passage of the FLSA, however, the Supreme Court determined that the mandatory liquidated damages were also compensatory, intended to reimburse workers for intangible losses-difficult to prove but nonetheless the very real consequences of unfair wages. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); Overnight Motor Transport Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942).
 
 
 86
 The Portal Act amendments of 1947, however, require review of whether liquidated damages under the FLSA are compensatory. The Portal Act allows the trial court to forgive liquidated damages when the employer shows that he acted in good faith and reasonably believed he had complied with the statute. 29 U.S.C. § 260 (1976). That "innocent" employers may now be spared FLSA liquidated damages could suggest that these damages are now penal. See, e.g., Richards, Monetary Awards in Equal Pay Act Litigation, 29 Ark.L.Rev. 328, 349 (1975). This court has yet to resolve this issue. Laffey, 567 F.2d at 465 n.271.
 
 
 87
 We now conclude that FLSA liquidated damages remain compensatory in character, even though they may be remitted.[24] Nothing in the statutory history of the Portal Act suggests that Congress was dissatisfied with the determination that liquidated damages were compensatory. Instead, the history of the Portal Act is replete with evidence that § 260 was intended to provide courts with flexibility when an award of liquidated damages would be unfair to the employer. E.g., H.R.Rep.No. 71, 93 Cong.Rec. 1489 (1947); 93 Cong.Rec. 1500 (1947) (Remarks of Rep. Robson); id. at 4389 (Remarks of Rep. Gwynne); see Hays v. Republic Steel Corp., 531 F.2d 1307, 1310 (5th Cir. 1976). A legislative decision to allow courts to balance compensating employees against imposing costs on employers hardly transforms the award to a penalty. Moreover, other sections of the FLSA do impose criminal penalties for willful violations, including willful violations of the Equal Pay Act. 29 U.S.C. §§ 216(a), 215(a) (2) (1976).[25]
 
 
 88
 Our determination that FLSA liquidated damages are not penal disposes of our final concern about whether plaintiffs' Equal Pay Act recovery period may reach before 1974. We therefore turn to GPO's contentions that it was entitled to remission of all or part of the liquidated damages award because of the equities it cites.
 
 
 89
 2. GPO's Good Faith. Section 260 allows the trial judge to remit liquidated damages if an employer shows both good faith and reasonable grounds for believing that he had conformed with the FLSA. As evidence of its good faith, GPO brings to our attention both the apprenticeship program and the fact that wages at GPO were set by negotiations with the union. Brief at 50. These contentions merit only brief consideration.
 
 
 90
 First, section 260 provides specifically that even if the employer meets his burden of proof, a decision to spare him liquidated damages remains "within the sound discretion" of the trial judge. Remission is not obligatory;[26] given the record in this case, we can hardly say that Judge Richey abused his discretion here.
 
 
 91
 Second, a showing of "good faith" does not suffice for defendant's two-pronged burden under § 260. Defendants must show both subjective good faith and objectively reasonable grounds for believing that their actions complied with the statute. 29 C.F.R. § 790.22(b) (1980); Laffey, 567 F.2d at 463. Certainly after the FLSA applied to the federal government, GPO did not have reasonable grounds for believing itself in compliance with the statute. Judge Richey found that GPO had willfully violated the Equal Pay Act, because it was "fully aware of the Equal Pay Act and adopted a deliberate and knowing course of conduct despite this awareness." J.A. 197. Indeed, GPO had been subject to a series of complaints, at least two unfavorable administrative reports, and finally, plaintiffs' lawsuit. GPO chose to defend the lawsuit, relying in large measure on traditional practices in the binding industry. However, as this court said in Laffey, "That an employer and others in the industry have broken the law for a long time without complaints from employees is plainly not the reasonable ground to which the statute speaks." 567 F.2d at 465.
 
 
 92
 Finally, GPO's showing of "good faith" is highly ineffectual. Judge Richey explicitly found that the apprenticeship program itself had discriminated against bindery workers. J.A. 179-83; see discussion infra p. 285. As for its contention that wages were set by negotiation with the union, GPO cannot seek absolution by claiming that its discrimination was another's fault. E.g., Laffey, 567 F.2d at 465.
 
 
 93
 3. GPO's Grounds for Believing it had not Violated the FLSA. GPO's final contention is that it was entitled to remission of whatever portions of the liquidated damages award antedated the extension of the FLSA to GPO. As with GPO's protestations of good faith, this argument can be answered by noting that remission of liquidated damages is discretionary. It can also be answered by pointing out that § 260 imposes a two-pronged burden on employers, to show both that they acted in good faith and that they had reasonable grounds for believing their actions did not violate the FLSA. In the absence of a showing of good faith, see supra p. 282, GPO has failed to shoulder its burden under § 260. It may also be noted that wage discrimination based on sex violated federal employment policy declared by Executive Order years before the extension of the FLSA to GPO, see supra p. 264.
 
 IV. THE CLAIM UNDER TITLE VII
 A. Title VII Liability
 
 94
 Title VII prohibits an employer from sexual discrimination among employees in the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1) (1976). It also forbids discriminatory classifications that affect employment opportunities, id. § 2000e-2(a)(2), and discrimination in the provision of training opportunities, id. § 2000e-2(d). Cases in which employees charge their employer with practices of discriminatory treatment based on sex follow an established legal format. First, the plaintiffs must prove a prima facie case: that they were treated differently because of their sex. If they succeed, the responsibility shifts to defendants to come forth with evidence that the practice had a legitimate business purpose. Finally, the plaintiffs have the opportunity to show that defendant's asserted purpose was pretextual. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972); Bundy v. Jackson, 641 F.2d 934, 951 (D.C.Cir.1981).
 
 
 95
 Judge Richey concluded that the plaintiffs had borne their ultimate burden of persuasion with respect to a number of practices at GPO. Specifically, he found first that the division drawn by GPO between the bookbinder and bindery worker classifications foreclosed opportunities within the Bindery. J.A. 192. Also found discriminatory was GPO's failure to provide on-the-job craft training to bindery workers, except by way of the limited, four-year apprenticeship program which gave bindery workers no credit for their own apprenticeship training and forced them to take a pay cut. J.A. 188-92. GPO's requirement that only workers with craft status could compete for supervisory positions was found to have discriminatorily denied plaintiffs access to these positions. J.A. 192. All these violations, Judge Richey held, extended to the entire plaintiff class.
 
 
 96
 In this appeal, GPO concedes that it violated Title VII by failing to provide craft training or supervisory opportunities for the Grade 3 and 4 bindery workers who operated machines.[27] With regard to the lower grade bindery workers, however, GPO contests Judge Richey's finding of Title VII liability. GPO argues that the lower grade bindery workers failed to establish their prima facie case and that GPO established the business necessity of the practices found discriminatory. Plaintiffs in their turn argue that Judge Richey's conclusions on Title VII liability do not go far enough. Judge Richey viewed the separate classification of bookbinders and bindery workers as discriminatory because of its effects upon advancement opportunities within GPO. Plaintiffs, however, urge us to conclude that the maintenance of separate pay scales for craft and non-craft employees at GPO is itself a classification in violation of Title VII. We uphold Judge Richey's liability findings in their entirety.
 
 
 97
 1. The Lower Grade Bindery Workers: Plaintiffs' Prima Facie Case. Plaintiffs' prima facie case of discriminatory denial of access to training and supervisory positions began with numbers: there were no female bookbinders at GPO until 1975; conversely, there was only one male bindery worker; bookbinders received training on new machines but bindery workers did not; only six bindery workers entered the apprenticeship program; the Bindery supervisory ranks were unrelentingly male. The "cold numbers" were brought "convincingly to life," International Brotherhood of Teamsters v. United States 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977), by tales of individual sexual bias and discouragement, J.A. 180-81.
 
 
 98
 GPO argues that this case was insufficient as a matter of law because it did not include individualized showings that the lower grade bindery workers were qualified for and interested in craft training. GPO insists that such showings were made legally necessary to a prima facie case of disparate treatment by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), a seminal decision outlining the steps of Title VII proof. In a suit in which a striker alleged that he had not been rehired because of his race, McDonnell Douglas set out four elements of a prima facie case of discriminatory treatment:
 
 
 99
 (1) the plaintiff belonged to a minority group;(2) the plaintiff had applied for the position at issue;
 
 
 100
 (3) the plaintiff was rejected; and
 
 
 101
 (4) the position remained open after the rejection.
 
 
 102
 411 U.S. at 802, 93 S.Ct. at 1824. McDonnell Douglas, in its own words, however, "concern(ed) the order and allocation of proof in a private, non-class action challenging employment discrimination." Id. at 800, 93 S.Ct. at 1823.
 
 
 103
 In a class action, on the other hand, proof that each individual class member is a victim of discrimination is not a necessary component of a prima facie case of a pattern and practice of discrimination. Teamsters, 431 U.S. at 357-62, 97 S.Ct. at 1865-1868; Franks v. Bowman Transportation Co., 424 U.S. 747, 771-73, 96 S.Ct. 1251, 1267-1268, 47 L.Ed.2d 444 (1976). Not until the relief stage, which we discuss infra at pp. 285-296, must evidence be offered that each class member sought or, absent discrimination, would have sought an employment opportunity. Teamsters, 431 U.S. at 362-66, 97 S.Ct. at 1868-1870. Moreover, once an individual employee proves that she sought or would have sought an employment opportunity, the employer must shoulder the burden of proving that the employee was denied the employment opportunity for legitimate reasons. Id. at 362, 97 S.Ct. at 1868; Franks, 424 U.S. at 772, 96 S.Ct. at 1267.
 
 
 104
 Especially in a class action suit alleging patterns of discriminatory conduct, the Supreme Court has explicitly held that convincing statistical evidence of disparity will demonstrate a pattern of illicit, discriminatory treatment. In the words of the Court:
 
 
 105
 We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases .... Statistics are equally competent in proving employment discrimination.
 
 
 106
 Teamsters, 431 U.S. at 339, 97 S.Ct. at 1856 (citations omitted); see also Reynolds v. Sheet Metal Workers, Local 102, --- F.2d ----, 25 Fair Empl. Prac. Cas. 837 (D.C.Cir.1981).[28] Statistical evidence of underrepresentation of a protected class may even raise a presumption that an individual employee has suffered from discriminatory treatment, as this circuit has held. Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); Davis v. Califano, 613 F.2d 957 (D.C.Cir.1979). The statistical case presented by plaintiffs here could hardly have been more convincing, and Judge Richey so found.[29]
 
 
 107
 2. The Lower Grade Bindery Workers: GPO's Defense. Once plaintiffs have successfully raised an inference of discriminatory conduct, the responsibility shifts to defendants to bring forth evidence that the practices at issue were established in the legitimate course of business. Given the broad remedial aims of Title VII, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this task is not easy. The employer must show that the practice at issue served some genuine business purpose, or the inference of discrimination will remain. E.g., Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251 (6th Cir. 1981); Kinsey v. First Regional Securities, Inc., 557 F.2d 830 (D.C.Cir.1977). The employer need not prove that the practice was the wisest or most lucrative but he must bring forth evidence of its legitimacy. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Furnco Construction Corp. v. Waters, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).
 
 
 108
 GPO contends that it established a defense to plaintiffs' prima facie case by showing that a four-year apprenticeship program was needed to train well-rounded bookbinders. Once again, we decline GPO's invitation to disagree with the trial court's assessment of the evidence. Judge Richey found that bookbinders did not rotate among jobs and did not need the more extensive training, J.A. 176-79. He also found that bookbinders received on-the-job training when bindery workers did not, J.A. 180, and that GPO hired bookbinders without ascertaining whether they had received the allegedly essential training. J.A. 183. Finally, he found that "(s)erious disincentives would exist for (bindery workers) considering apprenticeship," J.A. 180, so much so that the program represented "a virtually unobtainable goal" for them. J.A. 182. Such a program is not a business need but a roadblock, as Judge Richey properly concluded, J.A. 191.
 
 
 109
 GPO also contends that it presented legitimate business reasons for requiring craft status of applicants for promotion, and thus freezing out all bindery workers, including the prevailing Equal Pay Act plaintiffs. A review of the record, however, convinces us that Judge Richey justifiably concluded that GPO did not. Nor is there any allegation here that the challenged GPO practices were part of a bona fide seniority system, see American Tobacco Co. v. Patterson, --- U.S. ----, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).
 
 
 110
 3. Separate Classification of Bookbinders and Bindery Workers. Judge Richey concluded that the separate classification of bookbinders and bindery workers violated Title VII only insofar as it foreclosed opportunities for training and advancement within the Bindery. J.A. 203. The plaintiffs object to his refusal to find that the different classification of bookbinders and bindery workers itself violated Title VII and contend that they are owed back pay for the difference between their pay as bindery workers and what they would have earned as bookbinders.
 
 
 111
 In objecting to Judge Richey's refusal to merge the classifications and order back pay accordingly, the plaintiffs in their turn urge us to revise the trial court's assessment of the evidence. Judge Richey found that the plaintiffs had not presented evidence sufficient to raise the inference that GPO had violated Title VII by paying most bindery workers and bookbinders on separate wage scales. His reasoning was that the plaintiffs had failed to show substantial equality between the tasks of bindery workers other than the Smyth operators, on the one hand, and the tasks of bookbinders, on the other. J.A. 203. The record in this case, as we have already held, bears Judge Richey out. Moreover, plaintiffs made no showing beyond the effort to establish their Equal Pay Act case that GPO's wage scales resulted from discrimination. We therefore refuse to disturb Judge Richey's reading of the facts, and uphold his decision not to merge the classifications.[30]
 
 B. The Remedy Under Title VII
 
 112
 Under Title VII, the court has extensive remedial powers. When it finds an intentional violation, the court may
 
 
 113
 order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate.
 
 
 114
 42 U.S.C. § 2000e-5(g) (1976). In exercising these powers, courts are to be guided by complementary aims: discouraging employers from discrimination, and compensating discrimination's victims as fully as possible. Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In light of these goals, we commend the overall design of the Title VII remedy fashioned by Judge Richey, but remand for certain limited purposes.
 
 
 115
 1. The Monetary Awards. Both sides raise questions about the back and front pay pools constructed by Judge Richey. First, GPO contends that bindery workers should not have shared pro rata in the pools, without showing individually that they sought and were qualified for the training and supervisory opportunities that they were denied. Second, GPO argues that Judge Richey erroneously allowed the two-year Title VII recovery period to include time before the statute applied to GPO. Third, GPO asserts that the amount of the back pay award was erroneously inflated by calculating back pay amounts by reference to positions the plaintiffs might have filled, had they not been subject to discrimination after 1969, some three years before Title VII applied to GPO. Fourth, GPO contends that the termination formula for front pay-when women hold half of all craft and supervisory positions in the Bindery-is too generous. Finally, plaintiffs complain that Judge Richey failed to construct a front pay pool to compensate prevailing Equal Pay Act plaintiffs for denial of supervisory opportunities, a Title VII violation that did not duplicate their Equal Pay Act recovery.
 
 
 116
 a. The Need for Plaintiffs to Make Individualized Showings to Share in the Monetary Awards. In a class action, proof that the defendant has violated Title VII with respect to an entire plaintiff class does not immediately entitle individual class members to compensatory relief. To determine individual plaintiffs' entitlements, the court must normally conduct additional evidentiary proceedings. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 361, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977). Members of the class seeking relief must show that they were "potential victim(s) of unlawful discrimination," id. at 367, 97 S.Ct. at 1870. Class members who actually applied for the openings at issue can show victimization by merely indicating that they applied. Id. at 362, 97 S.Ct. at 1868. Non-applicants, however, face the more difficult task of showing that their failure to apply was one of the effects of discrimination. Id. at 364, 97 S.Ct. at 1869.
 
 
 117
 In the case at bar, few plaintiffs had applied formally for apprenticeship training or supervisory positions at GPO. The plaintiffs raised the issue whether individualized showings were to be required, R. 159 at 13, and argued that under Teamsters they were only required to show class membership, because all bindery workers could have applied for the openings at issue. They ultimately made no further showings, however, because GPO took the position that it did not care how the pay award was shared among the plaintiff class. R. 166 at 30 ("This money pool can be distributed among the class member (sic) as the Court sees fit.") See also Tr. Mar. 24, 1980 at 9. In this appeal, GPO reverses its position and contends that Teamsters required the plaintiffs to make individual showings in order to share in the remedy.
 
 
 118
 We hold that this contention comes too late. GPO waived the issue of further proceedings at the remedy phase, and cannot resurrect the claim now. See, e.g., Browzin v. Catholic University of America, 527 F.2d 843, 850 (D.C.Cir.1975) ("If appellant expected the court to assign (the burden of proof) to the University, he was under an obligation at least to apprise the court that there was some controversy over the matter."). See also EEOC v. Korn Industries, 662 F.2d 256 (4th Cir. 1981) (on appeal, EEOC cannot protest trial court's limited back pay award when it chose not to participate in case-by-case determination of damages). GPO is especially dilatory in making this contention on appeal because the plaintiffs specifically raised the issue during the remedy proceedings. For GPO to hang back at the trial level, and then complain on appeal is a trap play we cannot countenance. Judge Richey's decree therefore properly allowed the plaintiffs to share monetary relief on a pro rata basis.
 
 
 119
 b. Retroactive Liability Under the 1972 Amendments to Title VII. The federal government, and GPO, came within the scope of Title VII on March 24, 1972, Pub.L.No. 92-961, 86 Stat. 111 (1972), 42 U.S.C. § 2000e-16 (1976). Federal employees thus obtained a new means to enforce their preexisting right to be free from discrimination-in the case of GPO employees, a right dating at least from August 8, 1969, the date of the first Executive Order specifically prohibiting discrimination within GPO, 34 Fed.Reg. 12,985 (1969). See, e.g., Chisholm v. United States Postal Service, 665 F.2d 482, at 488 (4th Cir. 1981); Womack v. Lynn, 504 F.2d 267 (D.C.Cir.1964); Koger v. Ball, 497 F.2d 702 (4th Cir. 1974). The 1972 Amendments to Title VII also limited back pay recovery to two years from the date of plaintiff's administrative complaint, 42 U.S.C. § 2000e-5(g) (1976). The significant legislative history emphasizes that GPO had an obligation to shed discriminatory practices at least from 1969 on. The 1972 Amendments to Title VII only added a forum and procedures for federal employees-it was not the date of birth of the right to a federal job free of racial or sexual bias.
 
 
 120
 In this case, the plaintiffs' administrative complaint was filed on May 25, 1973. Judge Richey awarded back pay for the full two-year period, to May 25, 1971. Amounts of back pay were to be measured by events reaching back still further, to the date of the Executive Order prohibiting discrimination within GPO; plaintiffs' back pay pool was to be the additional level of wages they would have achieved, had they filled one-half of all craft and supervisory openings in the Bindery after August 8, 1969. Judge Richey's back pay award is thus retrospective in two respects. In this section, we consider the retroactivity problem analogous to the problem raised under the Equal Pay Act-whether the two-year period of back pay recovery may reach back before the effective date of the 1972 Amendments. In the next section, we consider whether the amounts of back pay due may be measured on the basis of events beyond the two-year accrual period.
 
 
 121
 As with our consideration of the retrospective reach of the period of Equal Pay Act relief, our analysis here is guided by Bradley v. School Board of City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). See Lawrence v. Staats, 665 F.2d 1256, 26 Fair Empl.Prac.Cas. 1225 (D.C.Cir.1981) (opinion accompanying denial of rehearing).[31] We are to apply the law as it now is-authorizing a two-year period of back pay recovery-unless statutory history or the requirements of justice demand we do otherwise.
 
 
 122
 Congress amended Title VII because it was deeply concerned about the poor record of the federal government in ending employment discrimination. See S.Rep.No. 415, 92d Cong., 1st Sess. 4 (1971); H.R.Rep.No. 238, 92d Cong., 1st Sess. 3-5 (1971), U.S.Code Cong. & Admin.News, 1972, p. 2137. It sought to require the federal government to "put its own house in order in terms of ending its own discriminatory employment practices," 117 Cong.Rec. 32,101 (1971) (Remarks of Rep. Badillo), and it regarded the matter as urgent.
 
 
 123
 To this end, Congress provided federal employees with a new arsenal of remedies-not rights, but remedies. Most importantly, these included a secure basis for resort to the courts and recovery of back pay. Although the Civil Service Commission indicated in hearings that federal employees could challenge discrimination in court,[32] Congress wished to make clear that the barrier of sovereign immunity had been overcome. See, e.g., 118 Cong.Rec. 4929 (1972) (Remarks of Sen. Cranston). No one questioned the appropriateness of allowing federal employees to recover back pay for a period antedating 1972. By contrast, Congress emphasized the importance of providing back pay for federal employees victimized by their government's discrimination. See, e.g., id. at 4923. (Remarks of Sen. Williams).
 
 
 124
 Moreover, the legislative history is explicit that Congress viewed the 1972 Amendments as vindicating existing rights. See Brown v. General Services Administration, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Both the Senate and the House Reports enumerated the then-existing prohibitions of discrimination in federal employment, including the Executive Order applying specifically to GPO:
 
 
 125
 The prohibition against discrimination by the Federal government, based upon the due process clause of the Fifth Amendment, was judicially recognized long before the enactment of the Civil Rights Act of 1964. Congress itself has specifically provided for nondiscrimination in the Federal government by stating that it is "the policy of the United States to insure equal employment opportunities for Federal employees without discrimination because of race, color, religion, sex, or national origin ..." ... The primary responsibility for implementing this stated National objective has been granted to the Civil Service Commission (sic) pursuant to Executive Order 11246 (1964) and more recently by Executive Order 11478 (1969).
 
 
 126
 S.Rep.No. 415, 92d Cong., 1st Sess. 12-13 (1971); see also H.R.Rep.No. 238, 92d Cong., 1st Sess. 22 (1971). Congress thus recognized in no uncertain terms the illegality of discrimination within GPO and other federal agencies, and sought to act against it.
 
 
 127
 Finally, the 1972 Amendments specifically provided that changes in enforcement proceedings including the availability of back pay should apply to pending charges and to all charges filed thereafter. Pub.L.No. 92-261 § 14, 86 Stat. 113 (1972). As to these enforcement provisions, Congress clearly intended to bring administrative complaints pending in 1972 and those filed subsequently within the same treatment category. See International Union of Electrical, Radio & Machine Workers v. Robbins & Myers Inc., 429 U.S. 229, 242, 97 S.Ct. 441, 449, 50 L.Ed.2d 427 (1976) (§ 14 applies to all Title VII enforcement procedures); Laffey, 567 F.2d at 467 (two year limit on back pay period does not apply to lawsuit filed before 1972, but applies to administrative complaints filed on that date and thereafter). Although this provision does not apply directly to the amendments which brought federal employees within Title VII, it covers them, because these amendments specify that federal employees are to have the benefits of the enforcement provisions. 42 U.S.C. § 2000e-16(d) (1976). The congressional scheme suggests we treat the lawsuit here in terms of the enforcement provisions we would apply to cases arising in their entirety after 1972-including, of course, back pay for as long as two years.
 
 
 128
 The legislative history thus contains no indication that Congress intended to prohibit Title VII back pay periods for federal employees from extending before 1972. To the contrary, Congress appears to have meant to provide federal employees with an effective remedy as quickly as possible. The considerations of justice at stake here, moreover, are the same ones that led us to permit retroactive reach of the Equal Pay Act back pay period.[33] Following Bradley, we conclude that Judge Richey's retroactive extension of the Title VII back pay period was proper.
 
 
 129
 We pause briefly, however, to explain why several lines of precedent cited by GPO do not preclude retroactive application of the Title VII back pay period. First, GPO, and the dissent, rely upon a line of precedent that articulates the extent of the right to bring suit under Title VII. It is settled that the right to sue under the 1972 Amendments to Title VII extends retroactively to administrative complaints or lawsuits pending on the effective date of the Amendments, Hackley v. Roudebush, 520 F.2d 108 (D.C.Cir.1975); Grubbs v. Butz, 514 F.2d 1323 (D.C.Cir.1975); Womack v. Lynn, 504 F.2d 267 (D.C.Cir.1974),[34] and to pre-1972 acts forming part of a process of discrimination continuing past 1972, Bethel v. Jefferson, 589 F.2d 631 (D.C.Cir.1978).[35] Plaintiffs may not, however, bring suit under the 1972 Amendments on acts of discrimination terminated before 1972, in the absence of a timely administrative complaint pending in 1972, Brown v. Turner, 659 F.2d 1199 (D.C.Cir.1981).[36] Nor may plaintiffs "resurrect" claims of employment discrimination on which the statute of limitations has run, by virtue of the fact that the impact of the discrimination continues to be felt. United Airlines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); Klapac v. McCormick, 640 F.2d 1361 (D.C.Cir.1981).
 
 
 130
 The plaintiffs here had no administrative complaint pending on the date Title VII applied to GPO; their right to sue GPO for acts of discrimination occurring before 1972 arises only because the acts were part of a series of violations that continued beyond 1972. From this, GPO would have us conclude that the plaintiffs' remedy is limited to the post-1972 acts of discrimination. We reject this inference. Depriving the plaintiffs of back pay for pre-1972 actions would undercut the remedial purpose of their lawsuit. Plaintiffs are entitled to sue on the continuing discrimination and should be allowed to recover for the entire period permitted by Title VII. See Chisholm v. United States Postal Service, 665 F.2d 482, at 490 (4th Cir. 1981) (allowing back pay for pre-1972 portions of allowable two-year period).
 
 
 131
 Second, GPO points out that federal employees may sue under the Constitution for damages caused by employment discrimination that occurred before 1972. Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The elements of a case of employment discrimination under the Constitution, however, are not the same as the elements of a Title VII violation, Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (proof of racially discriminatory purpose requisite for a constitutional violation). GPO therefore urges that pre-1972 acts of discrimination must be judged only under the constitutional standard. This too is a non sequitur. Title VII merely altered and clarified the remedies the plaintiffs may pursue, extending those under Title VII and precluding others. It did not alter the fact that GPO's acts of discrimination were illegal both under the Constitution and under Executive Orders, as Congress itself recognized. Moreover, for those federal employees it covers, Title VII provides the exclusive remedy for employment discrimination, Brown v. General Services Administration, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); Torre v. Barry, 661 F.2d 1371, 26 Fair Empl.Prac.Cas. 585 (D.C.Cir.1981), and they are entitled to the full range of remedies that Title VII provides.
 
 
 132
 c. Calculating the Back Pay Pool on the Basis of Events Dating Back to 1969. Because August 8, 1969, was the date of the first Executive Order specifically prohibiting discrimination within GPO, Judge Richey allowed back pay amounts to be a function of openings in the Bindery reaching back to that date. For example, for the pay period beginning May 25, 1971, the date on which plaintiffs' right to recover back pay begins, plaintiffs will recover the difference between their actual earnings and what they would have earned during the period had they filled one-half of craft and supervisory openings in the Bindery between 1969 and 1971. It is important to emphasize that this award does not allow plaintiffs to extend the two-year back pay period. It merely measures the recovery during a given pay period by including all the effects of a continuing process of illegal discrimination reaching back to 1969-just as victims of a series of tortious harms may recover damages accrued from the series within the limitations period, even though the statute of limitations may have run on the earliest harms in the series. See Restatement (Second) of Torts § 899(d) (1979); D. Dobbs, Remedies 336 (1973).
 
 
 133
 In analyzing the propriety of this method of calculating back pay, we consider first the general problem of whether Title VII back pay may be calculated by reference to illegal acts of discrimination that fall outside of the two year period of back pay accrual. Our starting point is that Title VII compensatory awards aim to make the victims of illegal discrimination whole, insofar as it is possible to do so. Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Laffey, 567 F.2d at 471. Lost pay, lost pension rights, lost benefits, or lost seniority must all be rectified, if they result from illegal discrimination. Of course, compensation is only due for the ravages of illegal discrimination.
 
 
 134
 When discrimination continues over time, as it did at GPO, the harms it causes are compounded. An employee denied a raise in one year will fall further behind if raises in subsequent years are a function of prior salaries. Likewise, an employee denied a promotion in a given year may be frozen out of additional promotional opportunities, unless the missed rung on the promotion ladder is somehow replaced. When the effects of illegal discrimination are compounded, basing the plaintiffs' compensation only on events within the two-year accrual period seriously shortchanges their recovery for the harm actually suffered during the accrual period itself. At least four circuits appear to have recognized this fact, as has our local district court. See Patterson v. Youngstown Sheet and Tube Co., 659 F.2d 736, 740 (7th Cir. 1981); Salone v. United States, 645 F.2d 875 (10th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); Crawford v. Western Electric Co., 614 F.2d 1300, 1309 (5th Cir. 1980); Verzosa v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 589 F.2d 974 (9th Cir. 1978); Chewning v. Schlesinger, 471 F.Supp. 767 (D.D.C.1979).
 
 
 135
 The legislative history of Congress' decision to limit Title VII compensation to two years further supports our decision to allow back pay awards to take into account the effects within the accrual period of illegal discrimination that came before. By in effect imposing a statute of limitations on Title VII, Congress intended to protect employers against the "enormous monetary penalties" that might result from "indefinite liabilities." H.R.Rep.No. 238, 92d Cong., 1st Sess. 66 (1971) U.S.Code Cong. & Admin.News 1972, p. 2175 (minority views). Representative Erlenborn, one of the staunchest defenders of limiting Title VII liability, emphasized that the purpose of the amendment was to confine the liability to reasonable stretches of time: "It is only fair to say that liability should not go back ad infinitum but that there should be some reasonable statute of limitations." 117 Cong.Rec. at 31,981 (1971).
 
 
 136
 Within the two-year period, however, Congress did not intend to diminish the recovery available. There is no evidence that Congress wished to remove the taint of illegality from discrimination upon which the limitations period had run. Nor is there evidence that Congress intended to insulate employers from liability for the latent effects of previous illegal discrimination. Indeed, in a section by section analysis in the Conference Report, Senator Williams pointed out the continuing broad scope of the back pay remedy:
 
 
 137
 The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.
 
 
 138
 118 Cong.Rec. 7168 (1972). Congress intended Title VII recovery to continue to make victims of illegal discrimination whole-but within a two-year period at the outside. We therefore hold that it is proper to allow acts of illegal discrimination lying beyond the two-year period of Title VII back pay accrual to affect the measurement of the award.
 
 
 139
 Judge Richey's award, however, involves the additional problem of whether the retroactivity involved in the reach to 1969 precludes the use of events beyond the two-year period to influence the award in this case. Our explanation of why on Bradley standards it does not, can be brief. We have found no indication in the history of the 1972 Amendments that such retroactivity is prohibited; rather, the history conveys Congress' intent to allow federal employees to realize their rights fully and to allow all employees to receive ample compensation for harm caused by discrimination. More than any other factor, Congress' explicit recognition of the illegality of federal discrimination by 1969 allays concern that selection of the 1969 date was manifestly unjust to GPO. We therefore affirm Judge Richey's decision to calculate back pay by measuring what plaintiffs would have earned, had they received a percentage of openings in the Bindery since 1969.
 
 
 140
 Finally, we turn to the plaintiffs' argument that Judge Richey should have calculated back pay amounts on the basis of acts of discrimination reaching back to 1965. While the congressional reports do suggest that discrimination in federal employment has probably been unconstitutional all along, see supra at p. 288, we cannot say that Judge Richey erred in selecting 1969 as the touchstone. At that time, with the Executive Order, promulgated under congressional authority, specifically outlawing sex discrimination in GPO, the illegality of GPO's discrimination stood out. Title VII relief is to be targeted to deter illegal discrimination and compensate its victims. The Executive Order put GPO on clear notice that it should have taken steps to end the discrimination within its work force. Such persistence in behavior identified as illegal is the kind of conduct at which deterrence can be aimed. Selection of the August 8, 1969 date, therefore, comports with the deterrence goals of Title VII. In addition, it makes plaintiffs whole for the effects of discrimination that had been identified clearly as illegal.
 
 
 141
 d. Termination Date for Monetary Relief. Because there are at present few craft and supervisory openings in the Bindery, some time may pass before plaintiffs can move into the jobs they have been unjustifiably denied. Judge Richey therefore ordered monetary compensation to continue into the future. A number of circuits have approved the use of such front pay to make plaintiffs whole for the losses caused by discrimination, and we join them. See, e.g., United States v. Lee Way Motor Freight, Inc., 625 F.2d 918, 932 (10th Cir. 1979); James v. Stockham Valves & Fitting Co., 559 F.2d 310, 358 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); Equal Employment Opportunity Comm'n. v. Enterprise Association Steamfitters, Local 638; 542 F.2d 579, 590 (2d Cir. 1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); Patterson v. American Tobacco Co., 535 F.2d 257, 269 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).
 
 
 142
 Awards of front pay are to be judged by the standards applied to all Title VII relief: whether they will further the goals of ending illegal discrimination and rectifying the harm it causes. We find that Judge Richey's structuring of the front pay award did not follow these standards in all respects, and therefore remand that portion of his decree.[37]
 
 The front pay decree reads:
 
 143
 until the class plaintiffs fill one-half of all promotion positions in the Bindery, for each pay period each Title VII plaintiff remains employed by defendant, she shall receive the difference between her wages and the wages she would have received on a pro-rata basis as if (bindery workers) for that pay period filled one-half of all promotion positions in the Bindery or a proportionate number of such promotion positions, whichever number is lower; provided, however, that no (bindery worker) receiving a promotion shall receive compensation under this paragraph after receiving said promotion.
 
 
 144
 J.A. 220. This language does not set out clearly the formula for calculating amounts of front pay. Front pay for a given pay period is apparently measured by the lesser of what the plaintiffs would earn if they immediately held half of craft and supervisory positions in the Bindery, or some unexplained "proportionate number" of such positions. The back pay formula, by contrast, awards plaintiffs what they would have earned during a given period had they received a half of all craft and supervisory openings in the Bindery after 1969. Judge Richey's front pay formula thus may yield far larger award amounts for a pay period than would the back pay formula applied to the same period. Front pay, however, should compensate plaintiffs only for the fact that the wrongs for which they are entitled to receive back pay cannot be righted without delay. We therefore remand the front pay award with directions to Judge Richey to construct the front pay pool as a continuation of the back pay pool. Whatever the formula on which they are constructed, the two pools must match.
 
 
 145
 Although the issue was not addressed specifically in this appeal, for purposes of the remand we note our approval of calculating back pay on the assumption that the plaintiffs should have received one-half of promotions within the Bindery after 1969. Given the mandate of the Executive Order in 1969 to take affirmative steps to end employment discrimination and the sorry situation at GPO, it was reasonable to have expected GPO to have filled craft and supervisory positions in the Bindery from the plaintiff class on an expedited basis. An allocation of one-half of the openings to the plaintiff class is certainly within the reasonable spectrum.
 
 
 146
 We also must remand with regard to the termination date for front pay. Under Judge Richey's decree, front pay continues until women hold one-half of all craft and supervisory positions in the Bindery. This date is conceivably thirty years in the future.[38] Front pay should persist, however, only until the wrongs for which the plaintiffs are owed back pay have been righted. For example, if Judge Richey once again determines that plaintiffs should receive back and front pay based on what they would have earned had they received half of all craft and supervisory openings after 1969, front pay should terminate if and when the plaintiffs reach the point of having received half of those openings. This calculation, no more onerous mathematically than Judge Richey's original formula, sets a goal for the termination of front pay that GPO can meet within a reasonable time. GPO will have the ability to terminate or shorten their period of front pay exposure by filling a fair percentage of vacancies in the Bindery with women.
 
 
 147
 e. Front Pay for Prevailing Equal Pay Act Plaintiffs. Judge Richey constructed a back pay pool to compensate the Smyth operators for not having received their fair share of supervisory promotions. Although the Smyth operators will receive back pay under the Equal Pay Act, this additional back pay award did not give them duplicate recovery. The wrong of denying them promotions was separate from the wrong of paying them inadequately for their work as Smyth operators, and they are entitled to compensation for both.
 
 
 148
 Judge Richey did not, however, construct an analogous front pay pool for the Smyth operators. He gave no reason for the omission and we can discern none. Front pay recovery for the Smyth operators will not duplicate their Equal Pay Act recovery. Because promotion opportunities open infrequently, some time will pass before the Smyth operators can bid on promotion positions. In the meantime, they will continue to suffer losses resulting from the prior foreclosure of promotion opportunities.
 
 
 149
 In constructing a front pay pool for Smyth operators, Judge Richey should be guided by our directions concerning front pay for the remainder of the plaintiff class. The front pay formula must mirror the back pay formula. Front pay is to be cut off when the wrong has ended and the entitlement of individual Smyth operators to front pay will of course terminate with their promotion.
 
 
 150
 2. The Injunctive Decree. Title VII grants the court wide discretion in formulating injunctive relief, which may include "affirmative action" and "any other equitable relief as the court deems appropriate," 42 U.S.C. § 2000e-5(g) (1976). To prevent further Title VII violations, Judge Richey enjoined GPO from discriminating on the basis of sex in providing training opportunities and filling promotion positions. J.A. 217-18. His decree, for example, required GPO to establish objective hiring criteria and take reasonable steps to recruit female applicants. Given GPO's inability or unwillingness to recognize discrimination, apparent in its conduct throughout, we do not question the trial judge's determination that a general injunctive decree was needed. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) ("(T)he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.").
 
 
 151
 Judge Richey's decree, however, contained two specific requirements that are more troublesome. First, he forebade GPO to hire bookbinders from outside the Bindery until all bindery workers in order of seniority had been offered the opportunity to bid on and train for bookbinder positions. J.A. 219. Second, he decreed that all supervisory openings were to be filled from the plaintiff class on a three to one ratio until women hold one-half of all supervisory positions in the Bindery, or GPO develops a promotion plan acceptable to the plaintiffs or the court, J.A. 223, 232. The problems raised by these provisions are similar.
 
 
 152
 Somewhat surprisingly, the acceptability of interim quotas in Title VII relief is a question of first impression in this circuit. Although some circuits impose more stringent limits on quotas than others, all other circuits have recognized the acceptability of at least some forms of interim quotas in Title VII relief.[39] Moreover, the Supreme Court has held that a quota imposed by another statute passes constitutional muster. Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (constitutionality of requirement that 10% of federal funds granted for local public works projects must be used to obtain services of minority businessmen).
 
 
 153
 We join our sister circuits in recognizing the acceptability of interim quotas in Title VII relief. There may be situations in which the carrot of a goal, or the stick of a required minimum, is necessary to encourage a dilatory or obstructive employer to end discrimination. Quotas, however, are a two-edged sword. While opening opportunities to the victims of discrimination, they foreclose the same opportunities to others, including those who have also suffered from discrimination. Quotas should not be prohibited totally; but they must be fashioned and used gingerly, with care to see that they wound as little as possible.
 
 
 154
 In carefully honing a quota, the court should be guided by at least four important considerations. First, it should draw the quota in as limited and short-term a fashion as possible, consistent with effective eradication of discriminatory practices. Second, the court should target the quota specifically at the discrimination to be brought to an end. Third, to the extent possible, it should avoid infringing on the competing, legitimate concerns of others. Finally, the court should consider whether alternative, equally effective methods could supplement or supplant resort to a quota. See United States v. City of Chicago, 663 F.2d 1354 (7th Cir. 1981).
 
 
 155
 While the quotas set by Judge Richey here would surely work major changes in employment practices at GPO, they fall outside these guidelines. First, they do not appear to have been based on consideration of how extensive the goals need to be to compel GPO to implement truly nondiscriminatory training and promotion procedures. Second, while they would vastly increase the number of women holding craft and promotion positions at GPO, they do not focus sharply on the particular acts of discrimination at issue: that GPO has systematically failed to hire, train, and promote qualified and available women. This deficiency is connected to another: that the quotas are not supplemented by other methods, such as special screening and training programs, designed to prepare bindery workers to enter the craft and supervisory ranks quickly. Instead, the decree requires that all members of the plaintiff class be offered training on bookbinder positions as vacancies occur. Training is to extend for "the minimum time required for the (bindery worker) to become proficient in such position consistent with safety and efficiency." J.A. 219. Members of the plaintiff class are to be offered the training on the basis of seniority, rather than on the basis of likely bookbinding skills. Because members of the plaintiff class would receive training only after vacancies occur, if some either drop out of or fail to complete the training, this method can be expected to result in delays to other bindery workers in reaching craft ranks. These delays could be eliminated, however, by screening programs and training offered generally before craft vacancies appear.
 
 
 156
 Most importantly, the quotas ignore the concerns of others who might wish to seek employment in the GPO Bindery, including both blacks and women from inside and outside GPO. The requirement that GPO forego all outside hiring and promotion of printing plant workers until all bindery workers have been offered the opportunity to train on craft positions could theoretically shut out other applicants for craft positions for as long as fifty years.[40] The requirement that members of the plaintiff class fill supervisory positions on a three to one ratio until women hold half of all such positions or GPO develops an acceptable plan is somewhat more limited, but may still foreclose the legitimate interests of others unnecessarily.
 
 
 157
 We therefore remand the quotas to Judge Richey, with instructions to reshape the injunctive decree along the four guidelines listed above. The first consideration must be what goals and timetables are needed to ensure that GPO provides training and supervisory opportunities on a genuinely non-discriminatory basis. Second, the decree should be tailored to the discrimination to be corrected at GPO: the failure to provide training and supervisory opportunities for those bindery workers who are interested in and would have been qualified for such advancement. Efforts should be made to ascertain to what extent interested and qualified members of the plaintiff class have actually been frozen out of such opportunities by the discriminatory practices found at GPO. Quotas and timetables should then be set to move bindery workers into what reasonably might have been their rightful place in the Bindery. Because of the longstanding and pervasive discrimination in the printing industry, women have been woefully underrepresented in craft and supervisory positions. Nonetheless, it is not clear that absent discrimination, the Bindery workforce could be expected to reflect the makeup of the general population. A far more useful starting place for determining bindery workers' rightful place would be to consider what percentage of bindery workers are desirous and capable of craft training. Reasonable goals and timetables could then be developed to see that these women move into craft positions at a rate that will bring discrimination in the Bindery to a swift end.
 
 
 158
 Third, we urge the district court to consider whether other methods are available to supplement quotas and shorten the period in which they are necessary. These other methods might include further attention to developing objective hiring and promotion criteria and impartial selection procedures within GPO. They might also include efforts to ascertain quickly which bindery workers are interested in and qualified for craft training. Furthermore, the parties might explore the feasibility of an expedited training program for interested bindery workers, rather than waiting for craft openings to offer bindery workers the opportunity for craft training.
 
 
 159
 Finally, our most serious concern about Judge Richey's original injunctive decree is that it would bar others seeking employment with the Bindery. Because of the dismal record of the printing industry generally in providing opportunities for minority groups, this foreclosure is especially troubling. Whatever timetables and goals appear necessary on remand should be chosen to affect the job opportunities of others as little as possible.
 
 V. CONCLUSION
 
 160
 The age and scope of this lawsuit mirror the age and scope of the discriminatory practices found at GPO. Even untoward events such as the death of the original trial judge, have protracted this cause celebre. The trial below engendered weeks of hearings, reams of briefs, and a plethora of legal and factual issues, many of first impression in this circuit. We commend Judge Richey for his persistence and perspicacity in bringing this glaring example of unfairness by government to termination. Even in those aspects where we reluctantly remand, we have directed that reformation begin with the remedial outlines established by Judge Richey.
 
 
 161
 We regret adding a chapter to this unduly protracted litigation. The parties themselves-particularly GPO, with its frequent requests for postponements-have played no small role in the delay. We urge both sides to cooperate in resolving as quickly as possible the few issues that remain on remand. More urgently, we admonish the GPO to break clean from its once accustomed ways and to accept the inevitability of equal treatment for women employees. No judge relishes an ongoing policing of remedies for past misconduct. The faster GPO brings its hiring and promotion practices to bear on the discrimination-skewed composition of its workforce, the sooner it can again devote its full energies to binding books.
 
 ROBB, Circuit Judge, dissenting in part:
 
 162
 I dissent from those portions of the majority opinion that hold the Government Printing Office (GPO) liable for discriminatory practices which occurred before the dates when the Equal Pay Act and Title VII became applicable to the federal government. I also dissent from the use of August 8, 1969 as the relevant date for determining monetary awards and interim relief. I concur in the rest of the majority opinion.
 
 
 163
 The Equal Pay Act did not become applicable to the federal government until May 1, 1974. Fair Labor Standards Amendments of 1974, Pub.L.No. 93-259, § 6(a), 88 Stat. 55, 58-59 (1974) (codified at 29 U.S.C. § 203 (1976)). The Act includes a three-year limitations period for the recovery of back pay in instances of willful violations. 29 U.S.C. § 255(a) (1976). The District Court found that the GPO had willfully violated the Act and applied the three-year period. Thompson v. Boyle, 499 F.Supp. 1147, 1174 (D.D.C.1979). There are twenty-eight Equal Pay Act plaintiffs in this case. The majority opinion affirms the award of back pay to each of these plaintiffs for three years prior to the date each consented to join the suit. It follows that five plaintiffs will receive back pay dating from July 21, 1971. Twenty-two plaintiffs will receive back pay dating from April 15, 1973. One plaintiff will receive back pay dating from March 7, 1976. Thus, for twenty-seven of the prevailing Equal Pay Act plaintiffs the GPO's liability will antedate the May 1, 1974 effective date of the Act's application to the federal government.
 
 
 164
 Title VII became applicable to the federal government on March 24, 1972. Equal Employment Opportunity Act of 1972, Pub.L.No. 92-261, § 717, 86 Stat. 103, 111-13 (1972) (codified at 42 U.S.C. § 2000e-16 (1976)). The Act provides that "(b)ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C. § 2000e-5(g) (1976). The Title VII plaintiffs filed their administrative complaint on May 25, 1973. The District Court awarded the full two years back pay. Thompson v. Boyle, 499 F.Supp. at 1172-74, and the majority opinion affirms this award. Thus, each Title VII plaintiff will receive back pay dating from May 25, 1971, approximately ten months prior to the March 24, 1972 effective date of the Title VII amendments.
 
 
 165
 The majority further holds that back pay should be computed on the basis of events occurring since August 8, 1969, the date of Executive Order 11478, 34 Fed.Reg. 12985 (1969). Executive Order 11478 stated it was the policy of the federal government to provide equal opportunity in federal employment for all persons and to prohibit employment discrimination. The amount of back pay each Title VII plaintiff receives will be the difference between what her wages were for each pay period between May 25, 1971 and May 25, 1973 and the wages she would have received on a pro rata basis if class members had filled one-half of all craft and supervisory positions that became available since August 8, 1969.
 
 
 166
 The back pay award under Title VII therefore operates retrospectively in two respects: (1) back pay is awarded from May 25, 1971, approximately ten months prior to the effective date of the Act and (2) the amount of back pay is calculated on the basis of events occurring since August 8, 1969.
 
 
 167
 In my opinion it is unfair to hold the GPO liable for conduct which was not prohibited by statute at the time it occurred. Title VII and the Equal Pay Act liability should accrue only from the time the Acts became effective, thereby providing the GPO with adequate notice that its employment practices could give rise to back pay claims by employees. The remedies sought by the plaintiffs in this case were prescribed by statute and they must correspond to the statutory schemes creating them.
 
 
 168
 The general rule is that statutes are to be applied prospectively unless there is clear legislative intent to the contrary. Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); Union Pacific Railroad v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913); Swinton v. Kelly, 180 U.S.App.D.C. 216, 220, 554 F.2d 1075, 1079 cert. denied, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); De Rodulfa v. United States, 149 U.S.App.D.C. 154, 161, 461 F.2d 1240, 1247, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972); 2 C. Sands, Statutes and Statutory Construction § 41.04 (4th ed. 1973).[1] As this court said in International Brotherhood of Boilermakers v. NLRB, 114 U.S.App.D.C. 372, 316 F.2d 373 (1963), "(i)t is settled law that statutes are not to be applied retroactively 'unless the words used are so clear, strong and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise satisfied.' " Id. at 374, 316 F.2d at 375 (quoting United States Fidelity & Guaranty Co. v. United States ex rel. Struthers Wells Co., 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908)). This rule has developed because "it is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair." 2 C. Sands, supra, at § 41.02.
 
 
 169
 An exception to this general rule is made for intervening changes in the law which occur while a case is pending. See United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). In such cases the new law is to be applied unless there is legislative intent to the contrary or manifest injustice would result. Bradley v. School Board of the City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Recognizing the exceptions to the general rule however we have held that Title VII applies retrospectively only to proceedings pending on the effective date of the 1972 amendments. As we said in Klapac v. McCormick, 205 U.S.App.D.C. 383, 388, 640 F.2d 1361, 1366 (1981), "The 1972 Act applies retrospectively only to proceedings pending on its effective date. Since appellant did not initiate her administrative complaint of sex discrimination until 1974, then, she cannot attribute her post-Act woes to pre-Act grievances." (footnotes omitted) Accord, Brown v. Turner, 212 U.S.App.D.C. 315, 317-318, 659 F.2d 1199, 1201-02 (1981); Siegel v. Kreps, 654 F.2d 773, 776 n.8 (D.C.Cir.1981); Grubbs v. Butz, 169 U.S.App.D.C. 82, 86, 514 F.2d 1323, 1327 (1975); Womack v. Lynn, 164 U.S.App.D.C. 198, 200, 504 F.2d 267, 269 (1974).
 
 
 170
 In concluding that application of the Equal Pay Act and Title VII should antedate the effective dates of the statutes, the majority relies principally on Bradley v. School Board of the City of Richmond, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In the Bradley case, the Supreme Court stated "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. Focusing upon this statement, the majority concludes retroactivity is appropriate here.
 
 
 171
 Properly construed, the Bradley decision applies only to situations in which an intervening change in the law has occurred while a proceeding is pending. This is abundantly clear from the facts of the case, the language of the opinion, and the precedents relied on. The District Court had approved an award of attorneys' fees to the plaintiffs based on its general equity power, but the United States Court of Appeals for the Fourth Circuit reversed because of the absence of any explicit statutory authorization for such an award. The Supreme Court held that section 718 of Title VII, the Emergency School Aid Act, 20 U.S.C. § 1617 (1976), which became effective while the case was pending on appeal to the Fourth Circuit, was applicable. The Court framed the question presented for review as:
 
 
 172
 ... not simply one relating to the propriety of retroactive application of § 718 to services rendered prior to its enactment, but rather, one relating to the applicability of that section to a situation where the propriety of a fee award was pending resolution on appeal when the statute became law.
 
 
 173
 416 U.S. at 710, 94 S.Ct. at 2015. In analyzing this question the Court made the statement relied on by the majority here that a court is to apply the law in effect at the time it renders its decision. The origin of this principle was attributed to Chief Justice Marshall's opinion in United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). In that case a French vessel had been seized by an American ship and condemnation procedures were instituted. The trial court held the vessel was not a lawful prize, but the Circuit Court reversed and entered a decree accordingly. While the case was pending on appeal to the Supreme Court, the United States entered into a convention with France which required the restoration of vessels captured but not yet definitively condemned before the exchange of ratifications. 5 U.S. (1 Cranch) at 107. The Supreme Court held that condemnation was not yet final because the condemnation order had been appealed; therefore, restoration was required. Id. at 109-10. Chief Justice Marshall stated:
 
 
 174
 It is, in the general, true, that the province of an appellate court is only to inquire whether a judgment, when rendered, was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional ... I know of no court which can contest its obligation. It is true, that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed, but in violations of law, the judgment must be set aside. (footnote omitted)
 
 
 175
 5 U.S. (1 Cranch) at 110. By extending the Bradley analysis to authorize retroactivity without regard for the pending case requirement, the majority ignores the general rule to which the Bradley decision is only an exception. Moreover, this approach does not give due deference to the role of Congress in enacting legislation. Under the traditional rule favoring prospective-only application, retroactivity is allowed only when the legislature has clearly mandated it. The majority's analysis, however, permits retroactivity unless the legislature has clearly prohibited it. The traditional rule recognizes that Congress has the responsibility of deciding when an act will take effect. The majority opinion usurps this legislative prerogative and reaches a result which I consider unjust. Therefore, I must dissent.
 
 
 
 [1]
 See, e.g., Blumrosen, Wage Discrimination and Job Segregation: The Survival of a Theory, 14 U.Mich.J.L.Ref. 1 (1980); Blumrosen, Wage Discrimination, Job Segregation, and Title VII of the Civil Rights Act of 1964, 12 U.Mich.J.L.Ref. 397 (1979); Gitt & Gelb, Beyond the Equal Pay Act: Expanding Wage Differential Protections Under Title VII, 8 Loy.Chi.L.J. 723 (1977); Nelson, Opton & Wilson, Wage Discrimination and the Comparable Worth Theory in Perspective, 13 U.Mich.J.L.Ref. 231 (1980); Note, The Bennett Amendment-Title VII and Gender-Based Discrimination, 68 Geo.L.J. 1169 (1980)
 
 
 [2]
 One other female apprentice, Mary Lovely, spent one week in the Bindery. There is dispute about why she left. GPO contends that she requested reassignment because she preferred a cleaner and better paying section of the production department, and that her original assignment to the Bindery had been a clerical error. GPO Brief at 12. Ms. Lovely testified that she had been repeatedly told during her week in the Bindery that it was not a place for a woman. Tr. Mar. 16, 1979, at 5
 
 
 [3]
 Some women have been promoted in the Bindery since the district court judgment in this case. See Washington Post, Nov. 12, 1981, § D.C. at 1, col. 1
 
 
 [4]
 See, e.g., Arrow-Hart, Inc. v. Philip Carey Co., 552 F.2d 711 (6th Cir. 1977). See generally 7 J. Moore, Federal Practice P 63.05 (2d ed. 1979); 11 C. Wright and A. Miller, Federal Practice and Procedure § 2922 (1973). It may be the duty of the trial judge even with the parties' consent to decision without retrial if the credibility of witnesses is in question. See Federal Deposit Ins. Corp. v. Siraco, 174 F.2d 360 (2d Cir. 1949)
 
 
 [5]
 Rule 52 requires the court to "find the facts specially and state separately its conclusions of law thereon ..." but does not require that they be stated in writing. Moore poses the hypothetical of what a successor judge may do when his predecessor issues oral findings of fact and conclusions of law. He concludes that some courts have allowed the successor to enter judgment, but notes that precedent from this circuit, Brennan v. Grisso, 198 F.2d 532 (D.C.Cir.1952) may cut against even permitting the successor to enter judgment. 7 J. Moore, Federal Practice P 63.04 (2d ed. 1979). There is no suggestion by Moore or any other authority that the successor judge is bound by the oral rulings of his predecessor
 
 
 [6]
 In arguing that the Federal Rules required Judge Richey to enter judgment, GPO confuses discretionary power with obligation. All of the authority cited by GPO for the proposition that Judge Richey had to enter judgment, GPO Reply Brief at 10-11, supports instead the proposition that the successor judge is empowered to enter judgment based on his predecessor's findings. Bangor & Aroostock Ry. v. Brotherhood of Locomotive Firemen & Engineers, 314 F.Supp. 352 (D.D.C.1970), aff'd in part and rev'd in part on other grounds, 442 F.2d 812 (D.C.Cir.1971); Makah Indian Tribe v. Moore, 93 F.Supp. 105 (W.D.Wash.1950), rev'd on other grounds, 192 F.2d 224 (9th Cir. 1951); The Del-Mar-Va, 56 F.Supp. 743 (E.D.Va.1944)
 
 
 [7]
 Given our decision that only Grade 4 bindery workers are entitled to relief, not much is at stake here. All five named plaintiffs were Grade 4s, and their Equal Pay Act relief will date from 1974. Twenty-two other Grade 4s filed consents in 1976, the date to which plaintiffs seek to have Equal Pay Act recovery made retroactive. One Grade 4 filed her consent in 1979; and one Grade 4 employed in 1976 remains unaccounted for
 
 
 [8]
 In reaching this conclusion, we intimate no view with regard to the propriety of Equal Pay Act notice in a lawsuit which proceeds under both the Equal Pay Act and Title VII. Such notice was sent without discussion of the issue in a prior case in this circuit, Laffey v. Northwest Airlines, 321 F.Supp. 1041, 1043 (D.D.C.1971), aff'd, 567 F.2d 429 (D.C.Cir.1976). At least one circuit has allowed notice in a suit filed under the Equal Pay Act alone. Braunstein v. Eastern Photographic Laboratories, Inc., 600 F.2d 335 (2d Cir. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1046 (1979). But see Kinney Shoe Corp. v. Vorhes, 564 F.2d 859 (9th Cir. 1977); LaChapelle v. Owens-Illinois, Inc., 513 F.2d 286 (5th Cir. 1975)
 
 
 [9]
 Compare Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1174 (3d Cir. 1977) (quoting remarks of Rep. Frelinghuysen and Rep. Goodell) with Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970) (quoting Senate and House Reports in support of "substantially equal" standard)
 
 
 [10]
 Senate Report at 3; H.R.Rep.No.309, 88th Cong., 1st Sess. 3 (1963) (hereinafter, House Report ); Corning Glass Works v. Brennan, 417 U.S. 188, 201, 94 S.Ct. 2223, 2231, 41 L.Ed.2d 1 (1974). See generally Murphy, Female Wage Discrimination: A Study of the Equal Pay Act 1963-1970, 39 U.Cin.L.Rev. 615 (1970)
 
 
 [11]
 Sullivan, The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case, 31 Ark.L.Rev. 545 (1978)
 
 
 [12]
 See, e.g., Equal Employment Opportunity Comm'n v. Kenosha Unified School Dist. No. 1, 620 F.2d 1220 (7th Cir. 1980); Horner v. Mary Inst., 613 F.2d 706 (8th Cir. 1980); Gunther v. County of Washington, 623 F.2d 1303 (9th Cir. 1979), aff'd on other grounds, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); Brennan v. South Davis Community Hosp., 538 F.2d 859 (10th Cir. 1976); Brennan v. Owensboro-Daviess County Hosp., Inc., 523 F.2d 1013 (6th Cir. 1975), cert. denied sub nom. Owensboro-Daviess County Hosp., Inc. v. Usery, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976); Hodgson v. Corning Glass Works, 474 F.2d 226 (2d Cir. 1973), aff'd on other grounds sub nom. Corning Glass Works v. Brennan, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Hodgson v. Fairmont Supply Co., 454 F.2d 490 (4th Cir. 1972); Hodgson v. Brookhaven General Hosp., 436 F.2d 719 (5th Cir. 1970); Shultz v. Wheaton Glass Co., 421 F.2d 259 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). The First Circuit appears not to have decided the question
 
 
 [13]
 Very few cases have raised this question. In Hodgson v. Daisy Manufacturing Co., 317 F.Supp. 538 (W.D.Ark.1970), aff'd in part and rev'd on other grounds in part, 445 F.2d 823 (8th Cir. 1971), the court found a violation where male gun assemblers were paid higher wages for assembling larger gun barrels with somewhat larger but slower presses than those employed by the women assemblers. See also Ridgway v. United Hospitals-Miller Division, 563 F.2d 923 (8th Cir. 1977) (job of female surgical assistant in opthamology substantially equal to job of male surgical assistant in urology, since both involved similar work with delicate instruments); Usery v. Allegheny County Institution Dist., 544 F.2d 148 (3d Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977), (jobs of beauticians and barbers substantially equal, even though the former used different tools such as curlers and hair irons). In Angelo v. Bacharach Instrument Co., 555 F.2d 1164 (3d Cir. 1977), the court held that female light assemblers had not carried their burden of showing their jobs were substantially equal to those of male heavy assemblers. In Angelo, however, the jobs were performed in different plant divisions and involved assembly of instruments as different as small gas detectors and large diesel fuel pumps. Id. at 1167
 
 
 [14]
 The Department of Labor was not given rulemaking power under the Equal Pay Act. House Report at 3; 109 Cong.Rec. 9209 (remarks of Rep. Goodell). These regulations are the Department's official interpretations of the Act, 29 C.F.R. § 800.1 (1980), and thus not entitled to the special deference given interpretation by agencies with rule-making power. Nonetheless, the Department of Labor is entitled to deference as the agency charged by Congress with enforcing the Equal Pay Act. See Federal Election Comm'n v. Democratic Senatorial Campaign Comm., --- U.S. ----, ----, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981)
 
 
 [15]
 Neither the Senate nor the House Hearings considered the application of the Equal Pay Act to jobs performed on different machines. Indeed, the hearings contain almost no discussion of the Act's implications for most jobs in heavy industry-apparently because of the assumption that women held very few such jobs similar to those held by men. See, e.g., Hearings on H.R. 3861, 4269 & Related Bills Before the Special Subcomm. on Labor of the Comm. on Education & Labor, 88th Cong., 1st Sess. 38 (1963) (statement of Esther Peterson) ("The occupation of operatives included 3.4 million women and 8.7 million men in 1962, but relatively few of these workers appeared to be doing similar work.") (hereinafter House Hearings ). Examples of similar work in industry that were discussed included selector, packer, and bench assembler. See, e.g., Hearings on S. 882 and S. 910 Before the Subcomm. on Labor of the Comm. on Labor & Public Welfare, 88th Cong., 1st Sess. 94 (1963) (statement of Minnie Miles). Indeed, the only mention of work on different machines in the entire hearings was Representative Thompson's observation that large and small punch presses would involve different effort, but might become equal if automation altered the operation of heavy presses. House Hearings at 168
 
 
 [16]
 See, e.g., D. Belcher, Compensation Administration 172-73 (1974) (example of steel industry plan classifying various machine jobs together); Dictionary of Occupational Titles 574-76 and Appendix (1977) (classifying together various bindery machine operations). For a criticism of the sex bias of certain job evaluation plans, see National Academy of Sciences, Job Evaluation: An Analytic Review (1979)
 
 
 [17]
 On fact situations quite similar to each other, courts have disagreed about whether unequal pay violated the Act. Compare Shultz v. American Can Co.-Dixie Products, 424 F.2d 356 (3d Cir. 1970) (work substantially equal even though night shift operators required to load paper onto machines for between 7 and 33 minutes per eight hour shift) with Wirtz v. Dennison Mfg. Co., 265 F.Supp. 787 (D.Mass.1967) (additional tasks of loading and machine repair on night shift warranted wage differential even though these tasks occupied less than 10% of working time). Also compare Brennan v. Board of Education of Jersey City, 374 F.Supp. 817 (D.N.J.1974) (male and female custodial jobs substantially equal even though additional male tasks included snow shoveling and buffing while additional female tasks included scouring down bathrooms and washing down furniture) with Usery v. Columbia University, 568 F.2d 953 (2d Cir. 1977) (not error to find heavy cleaning required greater effort on the part of male custodians). Courts also have disagreed about whether different kinds of effort may be compared. Compare Hodgson v. Daisy Manufacturing Co., 317 F.Supp. 538 (W.D.Ark.1970), aff'd in part and rev'd in part on other grounds, 445 F.2d 823 (8th Cir. 1971) (physical effort required in pressing larger gun barrels may be weighed against mental effort required in pressing smaller barrels) with Angelo v. Bacharach Instrument Co., 555 F.2d 1164 (3d Cir. 1977) (improper to compare physical and mental effort). Commentators tend to conclude that different kinds and amounts of effort may be balanced under the Equal Pay Act. E.g.. Johnson, The Equal Pay Act of 1963: A Practical Analysis, 24 Drake L.Rev. 570, 587 (1975); Sullivan, supra note 13, at 568
 
 
 [18]
 GPO Brief at 23. As GPO objects both to comparisons of different types of effort and to balancing effort against other Equal Pay Act factors, we note that GPO's own expert witness used a job evaluation plan that assigned "points" to job factors such as experience or physical demand and summed the results. The summation explicitly weighed different aspects of a job against each other. GPO's objections, therefore, undercut the presentation of its own witness
 
 
 [19]
 GPO was brought under the FLSA on May 1, 1974. For the five named plaintiffs, the three-year period of Equal Pay Act recovery runs from July 24, 1974. For 22 others, it extends from April 15, 1976; and for one, it begins March 7, 1979. J.A. 229
 
 
 [20]
 We note that GPO does not contest Judge Richey's finding that the Equal Pay Act violation was willful, and his resulting decision to set the applicable limitations period at three years
 
 
 [21]
 See also Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (Title II of the Civil Rights Act of 1964); Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941) (federal court bound to apply change in state workmen's compensation law); Carpenter v. Wabash Ry., 309 U.S. 23, 27, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940) (amendments to Bankruptcy Act). See generally H. Hart and H. Wechsler, The Federal Courts and the Federal System 316 n.4 (2d ed. 1973). The dissent contends that Bradley is limited to cases pending at the time of the legislative change at issue. We see no reason why a plaintiff who brings suit after the effective date of a new statute should be in a less favorable position than a plaintiff whose suit is pending when the change occurs, particularly where, as here, the statute merely extends the remedies available for the enforcement of existing rights. See 2 C. Sands, Statutes & Statutory Construction §§ 41.02, 41.09 (4th ed. 1973)
 22 U.S.Const., art. 1, § 9, cl. 3; Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Calder v. Bull, 3 U.S. (3 Dall.) 385, 386, 1 L.Ed. 648 (1798); Slawson, Constitutional and Legislative Considerations in Retroactive Lawmaking, 48 Cal.L.Rev. 216, 221-22 (1960). Even in criminal cases, the ex post facto restriction does not apply to purely procedural changes. E.g., Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
 
 
 [23]
 GPO contends that sovereign immunity insulates it from retrospective liability under both the Equal Pay Act and Title VII. Congress, however, waived sovereign immunity by authorizing suits against the federal government under the FLSA. See United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The question we face is whether Congress intended the statutory change, and hence the waiver, to have only prospective thrust
 
 
 [24]
 Accord, McClanahan v. Mathews, 440 F.2d 320 (6th Cir. 1971); Note, Good Faith Defenses Under the Portal-to-Portal Act of 1947, 17 Geo.Wash.L.Rev. 322 (1949); Note, Portal to Portal Act-Good Faith Provisions, 48 Colum.L.Rev. 443, 448-50 (1948). But see Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468 (5th Cir. 1979); Rothman v. Publicker Industries, Inc., 201 F.2d 618, 620 (3d Cir. 1953) (under Portal Act, liquidated damages "more than a compensatory burden")
 
 
 [25]
 Cf. Lorillard v. Pons, 434 U.S. 575, 582, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978) ("Congress expressly declined to incorporate into the (Age Discrimination in Employment Act) the criminal penalties established for violation of the FLSA.")
 
 
 [26]
 29 C.F.R. § 790.22(b) (1980); Laffey, 567 F.2d at 465; McClanahan v. Mathews, 440 F.2d 320 (6th Cir. 1971); Bertrand v. Orkin Exterminating Co., 454 F.Supp. 78 (D.Ill.1978)
 
 
 [27]
 GPO concedes the Title VII violation as to machine operators. GPO Brief at 28. We assume this means that GPO concedes discrimination both in failing to provide craft training for the operators and in foreclosing them from competition for supervisory positions
 
 
 [28]
 Accord, EEOC v. Korn Industries, 662 F.2d 256 (4th Cir. 1981); Weahkee v. Norton, 621 F.2d 1080 (10th Cir. 1980); Fisher v. Procter & Gamble Mfg. Co., 613 F.2d 527 (5th Cir.), cert. denied, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1980); Detroit Police Officers' Assoc. v. Young, 608 F.2d 671 (6th Cir. 1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981)
 
 
 [29]
 On this appeal, GPO contends for the first time that plaintiffs' statistical case erroneously compared the classes of "bindery workers" and "bookbinders." Once again, GPO urges inappropriate de novo review of the evidence. If we compared "noncraft workers in the Bindery" and "bookbinders," GPO contends, we would note that in addition to bindery workers, both male and female printing plant workers infrequently received craft training at GPO. GPO would then have us conclude that bindery workers have not suffered discrimination, because they are part of a larger group of employees who have not advanced in the Bindery. That GPO might have mistreated a group in addition to plaintiffs, however, does not show that bindery workers themselves were justifiably denied training by GPO
 
 
 [30]
 In upholding Judge Richey on this record, we do not foreclose the possibility that in an appropriate case plaintiffs might establish that unequal pay based on a job classification system violates Title VII, even though the jobs classified under the system are not equal for purposes of the Equal Pay Act. See County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)
 
 
 [31]
 In Lawrence, we refused to apply retroactively a 1980 Amendment extending the right to sue under Title VII to employees of the General Accounting Office. The difficulty posed by the case was that retroactive application of Title VII would have deprived plaintiff of his day in court, because the availability of a Title VII remedy precludes a federal employee from bringing an employment discrimination suit on other grounds such as the Fifth Amendment. Plaintiff's Title VII suit, however, was defective for failure to exhaust administrative remedies. Applying the Bradley analysis, we held that it would be manifestly unjust to apply Title VII retroactively to deprive plaintiff in this manner
 
 
 [32]
 Equal Employment Opportunities Enforcement Act of 1971: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 1st Sess. 296 (1971) (Statement of Irving Kator)
 
 
 [33]
 Moreover, no ex post facto concerns are present here, because back pay awards under Title VII are clearly not penal. See, e.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Nor need we discuss general concerns about sovereign immunity a second time, because once again the problem we face is not whether Congress waived immunity, but whether the waiver was prospective only. See supra note 23
 
 
 [34]
 The right probably also extends to an administrative complaint reaching final disposition before the Amendments' effective date, if the statutory time limit for the plaintiff to bring suit has not yet expired. See Shirey v. Devine, 670 F.2d 1188 at 1197-1198 (D.C.Cir.1982) (applying retroactively right to bring suit under Rehabilitation Act, 29 U.S.C. § 505 (Supp. III 1979), when final administrative action antedated statute, but right to bring suit had not yet expired on statute's effective date)
 
 
 [35]
 For discussions of continuing violations under Title VII, see generally Carty, The Continuing Violation Theory of Title VII After United Air Lines, Inc. v. Evans, 31 Hastings L.J. 929 (1980); Note, Continuing Violations of Title VII: A Suggested Approach, 63 Minn.L.Rev. 119 (1978)
 
 
 [36]
 It is now settled that the time limits for filing Title VII charges are not jurisdictional. Zipes v. Trans World Airlines, Inc., --- U.S. ----, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)
 
 
 [37]
 For purposes of the remand, we note that Judge Richey quite properly stipulated that individual plaintiffs should cease to receive front pay when they obtain craft or supervisory positions, and that plaintiffs remaining in the front pay pool will continue to receive their original pro rata shares only. GPO's obligation to pay front pay will therefore diminish markedly as plaintiffs move into craft and supervisory ranks
 
 
 [38]
 Thirty-one bookbinder vacancies opened up in the Bindery between 1972 and 1980, a rate of about four per year. Tr. Mar. 24, 1980, at 8. There were some 263 bookbinder positions in the Bindery in 1978; assuming the 25 prevailing Equal Pay Act plaintiffs immediately acquire craft status, approximately 107 craft openings will be needed before class plaintiffs hold half of all craft positions in the Bindery. At four vacancies per year, it will take roughly 27 years for the requisite number of vacancies to emerge. Moreover, as members of the plaintiff class resign or retire, drop out of craft training, or are found unsuitable for it, it can be expected to become increasingly difficult to fill craft openings from the plaintiff class
 
 
 [39]
 Chisholm v. United States Postal Service, 665 F.2d 482, at 498-499 (4th Cir. 1981); United States v. City of Chicago, 663 F.2d 1354 (7th Cir. 1981); Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256 (2d Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); United States v. Lee Way Motor Freight, Inc., 625 F.2d 918 (10th Cir. 1979); James v. Stockham Valves & Fittings Co., 559 F.2d 310, 356 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); United States v. International Union of Elevator Constructors, Local 5, 538 F.2d 1012 (3d Cir. 1975); Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. International Brotherhood of Electrical Workers, Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970)
 
 
 [40]
 In 1978, there were 246 members of the plaintiff class, twenty five of whom (the Smyth operators) will immediately become bookbinders. At a rate of approximately four bookbinder vacancies per year, it might take fifty years to produce the 221 vacancies needed for the other bindery workers. See supra note 38
 
 
 [1]
 See also Alyeska Pipeline Service Co. v. United States, 624 F.2d 1005, 1013 (Ct.Cl.1980); Watson v. Secretary of Health, Education and Welfare, 562 F.2d 386, 389 (6th Cir. 1977); Puget Sound Power & Light Co. v. Federal Power Comm'n, 557 F.2d 1311, 1314 (9th Cir. 1977); United States v. Richardson, 512 F.2d 105, 106 (3d Cir. 1975); Soria v. Oxnard School District Bd. of Trustees, 467 F.2d 59, 60 (9th Cir. 1972); Farmington River Power Co. v. Federal Power Comm'n, 455 F.2d 86, 90 (2d Cir. 1972)